# 13-772-cv

IN THE

## United States Court of Appeals

*for the*

## Second Circuit

HUGO GERARDO CAMACHO NARANJO,
JAVIER PIAGUAJE PAYAGUAJE,
*Petitioners*,

v.

CHEVRON CORPORATION,
*Respondent*,

STEVEN R. DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER,
DONZIGER & ASSOCIATES, PLLC,
*Movants*.

ON PETITION FOR WRIT OF MANDAMUS TO THE UNITED STATES
DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

**RESPONDENT CHEVRON CORPORATION'S ANSWER
TO PETITION FOR WRIT OF MANDAMUS**

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

*Attorneys for Respondent
Chevron Corporation*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, undersigned counsel state that Chevron Corporation is a publicly traded company (NYSE: CVX) that has no parent company.  No publicly traded company owns 10% or more of its shares.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................1

ISSUES PRESENTED..................................................................8

BACKGROUND ........................................................................9

    A.   The Lago Agrio Litigation in Ecuador.......................................10

    B.   Litigation in the Southern District of New York ........................14

        1.   Chevron's DJA Action and the *Naranjo* Decision.............................14

        2.   Chevron's RICO and Fraud Action (the Underlying Action).............16

REASONS FOR DENYING THE WRIT ...........................................22

    A.   Defendants Have Other Means to Obtain the Desired Relief and Their Petition Is Untimely.........................................................22

    B.   Defendants Have No "Clear and Indisputable" Right to Writ Relief ........25

        1.   The District Court Has Fully Carried Out the *Naranjo* Mandate .......25

        2.   The Motion for Summary Judgment Complies With *Naranjo* Because Defendants Put Recognition of the Judgment at Issue ........27

        3.   Mandamus Cannot Lie for Denial of Defendants' Attempts to Withdraw Their Affirmative Defenses.................................................34

        4.   The District Court's 28 U.S.C. § 1292(b) Denial Cannot Form the Basis for Mandamus and Did Not "Manufacture" a New "Claim".................................................................................39

THERE IS NO BASIS FOR REASSIGNMENT ...................................43

CONCLUSION ..........................................................................50

# TABLE OF AUTHORITIES

## Cases

*Alfadda v. Fenn*,
    966 F. Supp. 1317 (S.D.N.Y. 1997) ...................................................27

*Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp.*,
    920 F.2d 1127 (3d Cir. 1990) ................................................ 25, 33

*Bankers Life & Cas. Co. v. Holland*,
    346 U.S. 379 (1953)...............................................................23

*Chapman v. Bd. of Cnty. Comm'rs*,
    107 U.S. 348 (1883)............................................................ 24, 35

*Cheney v. U.S. Dist. Court*,
    542 U.S. 367 (2004)............................................................. 1, 22

*Chevron Corp. v. Berlinger*,
    629 F.3d 297 (2d Cir. 2011) ...................................................10

*Chevron Corp. v. Donziger*,
    768 F. Supp. 2d 581 (S.D.N.Y. 2011) ..................................... 14, 15

*Chevron Corp. v. Donziger*,
    886 F. Supp. 2d 235 (S.D.N.Y. 2012) ..................................... passim

*Chevron Corp. v. Naranjo*,
    667 F.3d 232 (2d Cir. 2012) ................................................. passim

*Chevron Corp. v. Naranjo*,
    No. 11-1150, 2011 WL 4375022 (2d Cir. Sept. 19, 2011)............... 6, 16, 43, 46

*City of New York v. Smokes-Spirits.com, Inc.*,
    541 F.3d 425 (2d Cir. 2008) ...................................................40

*Commc'n Workers of Am., AFL-CIO v. AT&T Co.*,
    32 F.2d 199 (3d Cir. 1991) ....................................................23

*D'Ippolito v. Cities Serv. Co.*,
    374 F.2d 643 (2d Cir. 1967) ................................................. passim

*Delgrosso v. Spang & Co.*,
    903 F.2d 234 (3d Cir. 1990) ...................................................26

*Donlon Indus., Inc. v. Forte*,
    402 F.2d 935 (2d Cir. 1968) ................................................................34

*E.S. v. Indep. Sch. Dist., No. 196 Rosemount-Apple Valley*,
    135 F.3d 566 (8th Cir. 1998) ..............................................................26

*Furguson v. Roberts*,
    11 F.3d 696 (7th Cir. 1993) ................................................................38

*Gallop v. Cheney*,
    660 F.3d 580 (2d Cir. 2011) ...............................................................45

*Gleason v. Jandrucko*,
    860 F.2d 556 (2d Cir. 1988) ................................................. 5, 19, 42

*Hemi Grp., LLC v. City of New York*,
    559 U.S. 1 (2010) ...............................................................................41

*In re Aguinda*,
    241 F.3d 194 (2d Cir. 2001) ...............................................................43

*In re Brown*,
    174 F. App'x 78 (3d Cir. 2006) ..........................................................24

*In re Chevron Corp.*,
    633 F.3d 153 (3d Cir. 2011) .................................................................7

*In re Cont'l Ill. Sec. Litig.*,
    985 F.2d 867 (7th Cir. 1993) ..............................................................26

*In re Deutsche Bank Trust Co. of Am.*,
    605 F.3d 1373 (Fed. Cir. 2010) .........................................................34

*In re Edwards*,
    375 F.2d 108 (2d Cir. 1967) .................................................................3

*In re FCC*,
    217 F.3d 125 (2d Cir. 2000) ...............................................................26

*In re Life Investors Ins. Co. of Am.*,
    589 F.3d 319 (6th Cir. 2009) ..............................................................23

*In re MidAm. Energy Co.*,
    286 F.3d 483 (8th Cir. 2002) ..............................................................26

*In re Schneider*,
    No. 573, 1999 WL 173251 (Fed. Cir. Jan. 21, 1999) ........................24

*In re Sterling-Suarez*,
   323 F.3d 1 (1st Cir. 2003)..................................................................31

*In re Tronox, Inc. Sec. Litig.*,
   No. 09 Civ. 6220 (SAS),
   2010 WL 2835545  (S.D.N.Y. June 28, 2010) ...................................11

*In re United States*,
   666 F.2d 690 (1st Cir. 1981)............................................................50

*Kahn v. Chase Manhattan Bank, N.A.*,
   91 F.3d 385 (2d Cir. 1996) ........................................................ 23, 35

*Kerr v. U.S. Dist. Court*,
   426 U.S. 394 (1976)..........................................................................23

*Klinghoffer v. S.N.C. Achille Lauro*,
   921 F.2d 21 (2d Cir. 1990) ..............................................................41

*Lago Agrio Plaintiffs v. Chevron Corp.*,
   409 F. App'x 393 (2d Cir. 2010) ................................................. 6, 48

*Linde v. Arab Bank, PLC*,
   706 F.3d 92 (2d Cir. 2013) ..............................................................34

*Liteky v. United States*,
   510 U.S. 540 (1994)..........................................................................44

*Litvinov v. Hodson*,
   905 N.Y.S.2d 400 (N.Y. App. Div. 2010) ........................................40

*Martens v. Thomann*,
   273 F.3d 159 (2d Cir. 2001) ............................................................49

*Murray v. Archambo*,
   132 F.3d 609 (10th Cir. 1998) .........................................................38

*My First Shades v. Baby Blanket Suncare*,
   No. 08-CV-4599 MKB,
   2012 WL 6675118 (E.D.N.Y. Dec. 21, 2012)...................................41

*N. Eng. Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*,
   352 F.3d 599 (2d Cir. 2003) ....................................................... 26, 31

*Prestige Builder & Mgmt. LLC v. Safeco Ins. Co. of Am.*,
   896 F. Supp. 2d 198 (E.D.N.Y. Oct. 10, 2012) ...............................41

*Ransmeier v. Mariani,*
   Nos. 11-175-cv, 11-640-cv,
   --- F.3d ----, 2013 WL 1981939 (2d Cir. May 15, 2013) ...................................45

*Reisner v. Gen. Motors Corp.,*
   511 F. Supp. 1167 (S.D.N.Y. 1981) ...................................................................37

*Richardson Greenshields Sec., Inc. v. Lau,*
   825 F.2d 647 (2d Cir. 1987) ...............................................................................23

*Rodriguez v. Lockheed Martin Corp.,*
   627 F.3d 1259 (9th Cir. 2010) ............................................................................23

*Rotter v. Leahy,*
   93 F. Supp. 2d 487 (S.D.N.Y. 2000) ..................................................................38

*SEC v. Rajaratnam,*
   622 F.3d 159 (2d Cir. 2010) ...............................................................................22

*Standard Fire Ins. Co. v. Knowles,*
   133 S. Ct. 1345 (2013)........................................................................................35

*State Trading Corp. of India v. Assuranceforeningen Skuld,*
   921 F.2d 409 (2d Cir. 1990) ....................................................................... 36, 38

*United States v. Fein,*
   504 F.2d 1170 (2d Cir. 1974) .............................................................................23

*United States v. Quintieri,*
   306 F.3d 1217 (2d Cir. 2002) .............................................................................25

*United States v. Robin,*
   553 F.2d 8 (2d Cir. 1977) ...................................................................................46

*United States v. Tenzer,*
   213 F.3d 34 (2d Cir. 2000) .................................................................................25

*United States v. Uccio,*
   940 F.2d 753 (2d Cir. 1991) ...............................................................................31

*Will v. United States,*
   389 U.S. 90 (1967)...............................................................................................23

*Williams v. Citigroup, Inc.,*
   659 F.3d 209 (2d Cir. 2011) ....................................................................... 34, 37

vi

*Yablonksi v. United Mine Workers of Am.*,
   454 F.2d 1036 (D.C. Cir. 1971) ........................................................................26

**Statutes**

28 U.S.C. § 1292(b) ........................................................................... passim

28 U.S.C. § 1782 ............................................................................................10

28 U.S.C. § 2201 ............................................................................................14

N.Y. C.P.L.R. § 5303 ............................................................................... 2, 27

**Rules**

Fed. R. Civ. P. 41 ..........................................................................................38

Fed. R. Civ. P. 60 .......................................................................... 6, 19, 40, 42

**Other Authorities**

Restatement (Second) of Contracts § 3 .......................................................35

Wright, et al., Charles Alan
   *Federal Practice & Procedure* § 1484 (3d ed. 2013) ................................ 3, 38

Wright, et al., Charles Alan
   *Federal Practice & Procedure* § 1487 (3d ed. 2013) ......................................36

## TABLE OF ABBREVIATIONS AND DEFINED TERMS

The following abbreviations and defined terms will be used in Respondent Chevron Corporation's Answer to Petition for Writ of Mandamus:

| | |
|---|---|
| Pet. | Petition for Writ of Mandamus filed by Petitioners Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje. |
| A | Petitioners' Appendix. |
| RA | Respondent's Appendix. |
| Dkt. | Docket in these proceedings, Case No. 13-772 (2d Cir.). |
| Ex. __ | Exhibits to the concurrently filed Declaration of Randy M. Mastro. |
| Chevron | Respondent and Plaintiff Chevron Corporation. |
| Donziger | Movants and Defendants Steven R. Donziger, The Law Offices of Steven R. Donziger, and Donziger & Associates, PLLC. |
| LAPs | The plaintiffs in the Lago Agrio litigation, including Petitioners and Defendants Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje. |
| Lago Agrio judgment | The judgment issued by Judge Nicolas Zambrano Lozada of the Sucumbíos Provincial Court of Justice of Lago Agrio, Ecuador on February 14, 2011. |
| Lago Agrio litigation | *Maria Aguinda et al. v. Chevron-Texaco*, the litigation brought by the LAPs in Lago Agrio, Ecuador. |
| Mastro Dec. | The concurrently filed Declaration of Randy M. Mastro. |
| Stratus | Former Defendants Stratus Consulting, Inc., Douglas Beltman, and Ann Maest. |

## PRELIMINARY STATEMENT

Mandamus is a "drastic and extraordinary" remedy, *Cheney v. U.S. Dist. Court*, 542 U.S. 367, 380 (2004), that has no application here. Defendants seek a writ of mandamus to vacate four separate pre-trial orders: (1) a July 31, 2012 order largely *denying* Plaintiff Chevron Corporation's motion for summary judgment on certain affirmative defenses; (2) a November 27, 2012 order denying Defendants leave to amend their answers to withdraw those same affirmative defenses; (3) a January 7, 2013 order denying an interlocutory appeal pursuant to 28 U.S.C. § 1292(b); and (4) a February 20, 2013 order striking the amended answers Defendants filed anyway in violation of the court's November 27 order. As supposedly related relief, Defendants also seek—for the sixth time—to have the district judge removed from presiding over the case.

The pre-trial orders Defendants challenge are all of the type routinely remedied upon appeal from final judgment—with the exception of the § 1292(b) order, which is not subject to appellate remedy at all—and Defendants have waited far too long to challenge them by mandamus. As for Defendants' claim that these orders violate the mandate of *Chevron Corp. v. Naranjo*, 667 F.3d 232 (2d Cir. 2012), this contention fails at the threshold because the mandate of *Naranjo* did not—and could not—require the district court to take any action with respect to this different case. The *Naranjo* case consisted of a single claim for declaratory

relief premised on the New York Recognition Act.  This Court's mandate required the district court to dismiss that action, which the court did at once upon remand. *Naranjo* is over, and its mandate has no application in the separate RICO and fraud case below, which this Court expressly stated it was not addressing:  "We decide only those issues that relate to the severed declaratory judgment claim and the district court's rulings thereon," *id.* at 238 n.8, and not the "separate proceedings between these parties on other causes of action before the same district court judge," *id.* at 239 n.11.

Moreover, the district court's four pre-trial orders do not conflict with either *Naranjo*'s holding or its reasoning.  *Naranjo* recognized the propriety of "[c]hallenges to the validity of foreign judgments" where the judgment creditor puts the foreign judgment at issue "'in a pending action by . . . affirmative defense.'"  *Id.* at 241 (quoting N.Y. C.P.L.R. § 5303).  That is exactly what happened here, when Defendants asserted defenses of res judicata and collateral estoppel.  By their broad terms, these defenses necessarily included the $18.2 billion Lago Agrio judgment that Defendants had argued in this and other U.S. courts was "res judicata," "collateral estoppel," and entitled to "deference" and "comity," and which is the only judgment referenced in Defendants' answers.  RA393–404; A1171; RA236.  Chevron properly sought summary judgment on these defenses.

Defendants' complaints that the district court later denied them leave to

withdraw these defenses and then struck the purported amended answers they filed, despite the court's denial, fare no better. These issues are not within *Naranjo*'s mandate, and regulating the minutiae of discretionary decisions in ongoing district court proceedings is not the function of mandamus, especially when Defendants delayed for months before filing a petition that is transparently calculated to disrupt the district court's long-scheduled trial of this action. *See, e.g.*, *In re Edwards*, 375 F.2d 108, 109 (2d Cir. 1967) (Friendly, J., concurring) ("mandamus will not lie 'for the purpose of pressing a premature appeal'"). In addition, there is nothing improper about a court refusing to permit a party to avoid or delay adjudication of contentions that party put at issue, especially where the party is making the same contentions in other pending cases.[1] Nor is it improper—much less mandamus-worthy—to strike unauthorized amendments submitted in defiance of a court order and Rule 15, as such pleadings are "without legal effect." Charles Alan Wright, et al., *Federal Practice & Procedure* § 1484 (3d ed. 2013); A1714.

In any event, and regardless of whether Defendants' estoppel defenses are in or out of the case, *Naranjo* did not, as Defendants claim, hold that any and all issues pertaining to the validity and legitimacy of the Lago Agrio judgment are off limits "*in any context.*" Pet. at 5. Chevron's affirmative RICO and fraud claims

---

[1]  *See, e.g.*, Ex. 1 at 21 (D.Md. Feb. 9, 2013) (LAPs urging denial of Chevron request because "judgments by Ecuador's sovereign courts are entitled to substantial deference under international law principles, and are entitled to preclusive effect").

3

necessarily implicate Defendants' misconduct in procuring, and then seeking to extort Chevron with, the corrupt Lago Agrio judgment.  Nothing about *Naranjo* prevents Chevron from pursuing its RICO and fraud claims to finality.  And Defendants cannot take key issues off the table—any more than they can immunize their own misconduct—simply by electing not to litigate certain defenses.

Also, while Defendants go on at great length about the district court's supposed disrespect for foreign courts, there is nothing about the challenged orders that is disrespectful to any court or precludes Defendants from filing any suit to enforce the Lago Agrio judgment anywhere in the world.  Indeed, Defendants have already done so, filing actions to enforce the Lago Agrio judgment in Argentina, Brazil, and Canada.  The courts in Canada and Argentina have rejected Defendants' efforts to date, with the Canadian court finding that Defendants "ha[d] no hope of success in their assertion that the corporate veil . . . should be pierced and ignored" and opining that the enforcement action would be more properly brought in New York.  RA1018; RA1010.  And during the time in which the district court supposedly was engaged in a "contempt[uous]" "race to *res judicata*" against foreign courts (Pet. at 4), the district court denied Chevron's motions for summary judgment on Defendants' defenses, *twice.  See Chevron Corp. v. Donziger*, 886 F. Supp. 2d 235 (S.D.N.Y. 2012); RA957.[2]

---

[2]    In fact, in support of this "racing" trope, Defendants identify only a single dis-

As for the district court's § 1292(b) order, this Court has found that manda-mus is not available where a court denies a request to certify an order for interlocu-tory appeal:  "[W]e cannot conceive that we would ever mandamus a district judge to certify an appeal under 28 U.S.C. § 1292(b) in plain violation of the Congres-sional purpose that such appeals should be heard only when both the courts con-cerned so desire."  *D'Ippolito v. Cities Serv. Co.*, 374 F.2d 643, 649 (2d Cir. 1967).

Moreover, Defendants' assertion that the district court's ruling "manufac-tured a claim [for Chevron] to 'set aside' the Judgment pursuant to its equitable powers and F.R.C.P. 60(d)" (Pet. at 3) mischaracterizes the order.  In fact, the court merely explained one reason why there was no need for an immediate appeal of a proposed question about the viability of a claim premised on fraud in obtaining a prior judgment—because the answer was well settled.  The specific language about which Defendants now complain (a reference to a potential claim "to 'set aside' the Judgment") was a hypothetical example illustrating that such actions had long been available, and a *direct* quotation from this Court's opinion in *Gleason v. Jandrucko*, 860 F.2d 556, 558 (2d Cir. 1988) ("Relief from a final judgment may also be obtained at any time by way of an *independent action* to set aside a judg-

---

trict court statement that post-dates *Naranjo*.  *See* Pet. at 13–14 (citing A1585–86).  Far from announcing "an effort to 'prejudice' the LAPs' recognition actions," *id*., this December 2012 discovery ruling accurately describes *Defendants'* effort to de-lay the district court proceedings to avoid resolution of the potentially prejudicial underlying racketeering and fraud claims.

ment for 'fraud upon the court.'" (quoting Fed. R. Civ. P. 60) (emphasis in original)). The district court's analysis had nothing to do with *Naranjo* and was not an abuse of discretion, much less one so clear and egregious as to warrant mandamus.

Finally, Defendants, for the *sixth* time, seek to remove the district judge from this case. But they offer no valid ground for reassignment. As this Court noted in denying Defendants' prior writ petition attacking the same judge for the same basic reasons, "'bias cannot be inferred from a mere pattern of rulings by a judicial officer, but requires evidence that the officer had it in for the party for reasons unrelated to the officer's view of the law[.]'" *Chevron Corp. v. Naranjo*, No. 11-1150, 2011 WL 4375022, at *1 (2d Cir. Sept. 19, 2011) (citation omitted). Defendants present no evidence of such bias because it does not exist. On the contrary, the district court has done a remarkable job managing a complex case in an efficient and evenhanded manner. It has granted significant motions by Defendants and denied many by Chevron—including the summary judgment motion about which Defendants principally complain. This Court previously praised "the exemplary manner in which the able District Judge has discharged his duties" in a related case, *Lago Agrio Plaintiffs v. Chevron Corp.*, 409 F. App'x 393, 396 (2d Cir. 2010), and the judge has continued to discharge his duties in that same manner.

While Defendants may not like some of the district judge's rulings, his rulings are not outliers: No fewer than six other federal courts have found that there

is at least prima facie evidence that Defendants' conduct constitutes a crime or fraud.[3]  This is not a function of bias, but of *evidence*, which shows, among other things, that Defendants themselves ghostwrote the report of the supposedly independent court expert in Ecuador attributing $27 billion in damages to Chevron—a fraud for which "there is no genuine dispute as to exactly what happened." *Donziger*, 886 F. Supp. 2d at 259.  Defendants do not dispute that their confidential, unfiled work product is found verbatim in the judgment, and they are unable to show that the copied sources are in the Ecuadorian court record or explain how they came to appear in the judgment.  As another district court noted, if there were a legitimate explanation, Defendants would have provided it by now.  RA1035 (D. Md.) (noting Defendants' "inability . . . to identify a single explanation" for the "blatant cut and paste exercise" in the judgment after "more than a year-plus").

---

[3]  *See In re Chevron Corp.*, 633 F.3d 153, 166 (3d Cir. 2011) ("[W]e agree with the District Court's conclusion that the first element of the crime-fraud exception to the attorney-client privilege applie[s] . . . ."); RA1035 (D. Md. Jan. 25, 2013); Ex. 3 at 11 (D.N.M. Sept. 13, 2011) ("The Court concludes that these discussions trigger the crime-fraud exception, because they relate to corruption of the judicial process, the preparation of fraudulent reports, the fabrication of evidence, and the preparation of the purported expert reports by the attorneys and their consultants."); Ex. 4 at 9 (S.D. Cal. Sept. 10, 2010) ("There is ample evidence in the record that the Ecuadorian Plaintiffs secretly provided information to Mr. Cabrera, who was supposedly a neutral court-appointed expert, and colluded with Mr. Cabrera to make it look like the opinions were his own."); Ex. 5 at 12 (W.D.N.C. Aug. 30, 2010); Ex. 6 at 44 (D.N.J. June 11, 2010) ("[T]he provision of materials and information by consultants on the litigation team of the Lago Agrio plaintiffs in what appears to be a secret and an undisclosed aid of a supposedly neutral court-appointed expert in this Court's view constitutes a prima facie demonstration of a fraud on the tribunal.").

Unable to defend themselves on the merits and with a trial fast approaching, Defendants seek to give themselves "veto" power over the assigned judicial officer by subjecting him to a concerted strategy of obstruction and opprobrium, including disrespectful, personal attacks both in court and in the press. *E.g.*, Dkt. 58-4 (accusing the district judge of being "truly corrupt" and a "racist"). In the face of these shameful tactics, the district judge has conducted himself with patience and probity, and Defendants' strategy is worthy of nothing but rebuke.

## ISSUES PRESENTED

1. *Naranjo* was a separate case that did not resolve or even discuss Chevron's RICO or other causes of action pending below, and it recognized the propriety of challenges to the validity of a foreign judgment when a judgment creditor puts a judgment at issue in an affirmative defense. Should this Court now employ the extraordinary remedy of mandamus to vacate three of the district court's rulings on Defendants' affirmative defenses of collateral estoppel and res judicata premised on the Ecuadorian judgment, and a fourth ruling in which the court opined (in the context of denying leave to pursue an interlocutory appeal) on the hypothetical viability of claims premised on fraud in obtaining a prior judgment?

2. If this Court issues a writ of mandamus, should it also reassign the case on remand to a different district judge and reward Defendants' strategy of attacking judges publicly without any evidence of bias, notwithstanding the tremen-

8

dous duplication of effort that would result?

## BACKGROUND

Defendants and their agents based in the U.S. and elsewhere, led by New York lawyer Steven Donziger, are engaged in a wide-ranging scheme to extort billions of dollars from Chevron.  Their plan involves, among other things: (1) fabricating (principally in the U.S.) false evidence for use in an Ecuadorian lawsuit, (2) seeking to falsely induce U.S. governmental officials, state agencies, and shareholders to take adverse actions against Chevron, (3) corrupting and intimidating the Ecuadorian judiciary to obtain a tainted judgment, (4) exerting pressure on Chevron to coerce it to pay money not only by means of the fraudulent Ecuadorian litigation and judgment, but also by subjecting Chevron to public attacks in the U.S. and elsewhere based on false and misleading statements, and (5) making false statements to U.S. courts, and intimidating and tampering with U.S. witnesses to cover up and further their improper activities.  *See generally* A621–792.

In response to this scheme, Chevron sought discovery in various U.S. courts and began to uncover the massive fraud being perpetrated against it.  Chevron ultimately obtained what the Southern District of Florida has described as "mounds of evidence" revealing Defendants' crimes and other misconduct.  Ex. 7 at 4.  As the Western District of North Carolina put it, "what has blatantly occurred in this

matter would in fact be considered fraud by any court." Ex. 5 at 12.[4]  Based on

this extensive evidence, Chevron brought suit against Defendants in the Southern

District of New York in February 2011.  The parties are now actively litigating

Chevron's RICO, fraud, and other claims.  Defendants have resorted to every con-

ceivable strategy to attempt to derail this litigation and avoid a ruling on the merits,

while at the same time pursuing multiple foreign enforcement actions.

Defendants now attempt to have this Court wade into the merits of this on-

going litigation by presenting a distorted picture of events spanning decades and

continents, most of which are irrelevant to the consideration of any mandamus is-

sues.  Accordingly, Chevron will not respond to all of the innumerable inaccura-

cies in Defendants' filings.  Subsection (A) below provides a brief overview of the

fraudulent Ecuadorian litigation and the evidence that Chevron has uncovered.

Subsection (B) describes the relevant procedural history of the litigation below.

## A.    The Lago Agrio Litigation in Ecuador

On May 7, 2003, Defendants in the underlying action caused a complaint to

---

[4]    Defendants fault Chevron for filing a "cavalcade" of discovery actions under 28 U.S.C. § 1782.  Pet. at 9.  But the number of separate § 1782 actions reflects the numerous U.S. participants in Defendants' scheme—the statute requires actions to be filed in the "district in which a person [from whom discovery is sought] resides or is found."  28 U.S.C. § 1782.  And far from a bad-faith strategy to drain De-fendants' funds, these actions revealed abundant evidence of their fraud, including the outtakes from the film *Crude* that this Court ordered produced, *Chevron Corp. v. Berlinger*, 629 F.3d 297, 308–11 (2d Cir. 2011), and that "sent shockwaves through the nation's legal communities."  Ex. 8 at 3 (D.N.M. Sept. 1, 2010).  The massive, unanswered evidence debunks Defendants' "war of attrition" slogan.

be filed against Chevron in Lago Agrio, Ecuador, in the name of 48 Ecuadorians, including Defendants Naranjo and Payaguaje. The Lago Agrio lawsuit sought to hold Chevron liable for supposed environmental harm allegedly caused by Texaco, Inc.'s fourth-tier subsidiary, Texaco Petroleum Company ("TexPet"), which operated in Ecuador from 1964 to 1992. *Donziger*, 886 F. Supp. 2d at 242–43.[5] But as the Lago Agrio Plaintiffs' ("LAPs") former lead scientist has testified, the "environmental evidence did not and does not support the [LAPs'] claims." RA1021.[6]

Thus, instead of pursuing the case on its merits, the LAPs' agents—led by Donziger—perpetrated a scheme that included acts of fraud, collusion, and bribery to obtain an $18.2 billion judgment against Chevron. *See, e.g.*, *Donziger*, 886 F. Supp. 2d at 252–62; RA829–44; A1681–89. Seven federal courts have found Defendants' conduct satisfied at least the first prong of the crime-fraud exception to

---

[5]    Chevron never operated in Ecuador. A Chevron subsidiary merged with Texaco in 2001, but Chevron itself "did not acquire any of Texaco's assets or liabilities." *Donziger*, 886 F. Supp. 2d at 243; *see* RA369; *In re Tronox, Inc. Sec. Litig.*, No. 09 Civ. 6220 (SAS), 2010 WL 2835545, at *15–16 & n.209 (S.D.N.Y. June 28, 2010) (holding no successor liability results from reverse-triangular merger).

[6]    In 1964, TexPet began exploring and drilling for oil in Ecuador; the following year, it joined a consortium to operate a petroleum concession there. *Donziger*, 886 F. Supp. 2d at 241. By 1976, the state-owned oil company, Petroecuador, had gained a controlling interest in the consortium. *Id.* After TexPet's interest in the consortium ceased in 1992, it entered into an agreement with the Republic of Ecuador ("ROE") and Petroecuador under which TexPet would conduct environmental remediation of its share of the former oil operations sites in exchange for a release of claims by the ROE and Petroecuador. *Id.* at 242. In 1998, the ROE, Petroecuador, and TexPet executed a final release, which certified that TexPet had "fully performed" its obligations and "releas[ed], absolv[ed], and discharg[ed]" TexPet from any environmental liability. *Id.*

11

the attorney-client privilege.[7]

**The Cabrera Report.**  Among other acts of deceit, Defendants blackmailed the then-presiding Ecuadorian judge to appoint a supposedly impartial and independent "global damages" expert, Richard Cabrera, and then secretly ghostwrote the report that he submitted as his own.  *Donziger*, 886 F. Supp. 2d at 256–60.  Before Cabrera's appointment as the "neutral" expert, the LAPs' agents, including Donziger and U.S.-based environmental consultants Stratus, held a secret planning session with Cabrera that, according to Donziger, was designed to "lay out the entire case and legal theory for Mr. Cabrera and the other participants in the meeting."  *Id.* at 258.  There is "no genuine dispute as to exactly what happened" next:  "As Donziger has admitted, 'Stratus wrote the bulk of the report adopted by Cabrera and submitted to the court.'"  *Id.* at 259–60; *see also* RA896–99; RA925–26.

After the Cabrera report was filed, Defendants submitted sham objections to the report they had just written, criticizing it as "unjustly favorable to" Chevron.  RA40.  They then ghostwrote "Cabrera's" responses, intentionally drafting them to "sound[] more like [Cabrera]."  RA101–02.

Former members of the LAPs' team confirm that Defendants controlled Cabrera and ghostwrote his report.  A former LAP expert, Fernando Reyes, who

---

[7]    *See* RA815; *supra* n.3.  In addition, the international arbitral tribunal presiding over Chevron's related action against the ROE has found the evidence sufficient to warrant an interim award requiring the ROE to prevent enforcement of the Lago Agrio judgment, though to date the ROE has refused to comply.  RA773–75.

participated in the secret meeting with Donziger, Stratus, and Cabrera, has declared that it was "obvious" from that meeting that they "would write a report that would support their claim for billions of dollars against Chevron and would simply put Mr. Cabrera's name on it." RA482–84. And Stratus employees Douglas Beltman and Ann Maest have admitted that they wrote the bulk of the Cabrera report at the direction of Donziger—who ordered them to keep silent about their participation in its drafting—and have since disavowed its scientific findings. RA888–933.

**Judgment Fraud.** The evidence also shows that the LAPs' agents secretly wrote the $18.2 billion Lago Agrio judgment itself. *See, e.g.*, *Donziger*, 886 F. Supp. 2d at 253–55, 286–87; RA834–36. Fifty-two of the judgment's 188 pages contain material that is "virtually identical" to "internal LAP documents that never were part of the Ecuadorian court record" and the district court has found that there is "probable cause to suspect that the LAPs, not the judge, wrote the relevant part of the Judgment." RA834–36. The Southern District of Florida has reached the same conclusion. *See* Ex. 7 at 4–5. And, as the District of Maryland has noted, even now, "more than a year-plus" since Chevron first put forth judgment ghost-writing evidence, Defendants are unable "to identify a single explanation in that record" of how their own confidential materials got into the judgment. RA1035.

Recently, a key insider has come forward with evidence that explains the overlap, by confirming that Defendants drafted the judgment and bribed the issuing

judge.  Alberto Guerra—who was secretly paid to ghostwrite orders in civil cases for Judge Zambrano (who signed the Lago Agrio judgment)—has testified that the LAPs' counsel promised Judge Zambrano a $500,000 bribe in exchange for issuing a judgment drafted by the LAPs' counsel.  A1633–40.  Documentary evidence—including Guerra's bank and shipping records and computer files—and other witnesses corroborate his account, which has now been confirmed in a deposition. *See, e.g.*, RA697–98.

## B.    Litigation in the Southern District of New York

Chevron filed suit against the LAPs, Donziger, and some of their agents in the Southern District of New York based on their corrupt scheme to obtain and then leverage the Lago Agrio judgment to extort Chevron.  The district court eventually severed Chevron's lawsuit into two independent actions:  (1) an action on a single claim under the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201, No. 11-cv-3718 (S.D.N.Y.); and (2) a separate action on Chevron's remaining claims, including RICO and fraud, No. 11-cv-0691 (S.D.N.Y.).  RA239–41.

### 1.    Chevron's DJA Action and the *Naranjo* Decision

In February 2011, the district court issued a preliminary injunction against Defendants' attempts to enforce the Lago Agrio judgment.  *See Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581 (S.D.N.Y. 2011), *rev'd sub nom. Naranjo*, 667 F.3d at 247.  The district court limited its analysis to Chevron's DJA claim, which

14

sought a declaration "that the Lago Agrio judgment is not entitled to recognition or enforcement in the United States or anywhere else." *Donziger*, 768 F. Supp. 2d at 626. Defendants appealed, and this Court reversed. *Naranjo*, 667 F.3d at 247.

Recognizing that Chevron's RICO and other state-law claims were pending in a separate action and thus not part of the preliminary injunction analysis, this Court "decide[d] only those issues that relate to the severed declaratory judgment claim and the district court's rulings thereon." *Id.* at 238 n.8. The Court focused its analysis on the scope of the DJA and the Recognition Act, stating that "[c]hallenges to the validity of foreign judgments under the Recognition Act can occur only after a bona fide judgment-creditor seeks enforcement" of a judgment. *Id.* at 241. Because Defendants had not yet sought to enforce the Lago Agrio judgment in New York (or anywhere at that point), this Court "vacate[d] the injunction, and remand[ed] to the district court with instructions to dismiss Chevron's declaratory judgment claim." *Id.* at 234.

The Court made clear it was not passing on Chevron's separate RICO and fraud claims: "[N]otwithstanding the continuation of separate proceedings between these parties on other causes of action before the same district court judge," its decision "completely dispose[d] of the underlying action, leaving nothing further to be addressed on remand with respect to the severed claim." *Id.* at 239 n.11; *see also id.* at 246 n.17. The Court also denied the LAPs' request for reassignment

on remand, as well as their mandamus petition seeking the district judge's recusal. *Id.* at 239 n.11; *Naranjo*, 2011 WL 4375022, at *1.

This Court's mandate issued on February 16, 2012, and the district court promptly ordered Chevron's declaratory judgment action dismissed.  A1275.

### 2.    Chevron's RICO and Fraud Action (the Underlying Action)

In September 2011, litigation of Chevron's severed claims resumed in the separate RICO and fraud action.

### a.    The Four Orders That Defendants Challenge Here

1. <u>Denial of Chevron's Summary Judgment Motion</u>.  In March 2012, Chevron sought summary judgment as to Defendants' affirmative defenses of res judicata and collateral estoppel.  A1276.  Defendants did not immediately disclaim reliance on the Lago Agrio judgment, but instead asked the district court to "strike" Chevron's motion as "premature[]."  RA372.  Defendants next sought an extension of time to oppose the motion, on the ground that they needed "an opportunity to organize some response to the legal arguments and thousands of pages of exhibits." RA461.  The court granted an extension.  RA375.

But then Defendants changed tactics.  They did not respond to Chevron's legal arguments or the "thousands of pages of exhibits."  Instead, Defendants filed a ten-page opposition claiming that Chevron's motion was "moot" because they did not intend to invoke the preclusive effect of the Lago Agrio judgment as a defense

16

in *these* proceedings.  A1375.  They did not attempt to demonstrate that any other specific judgment was entitled to res judicata or collateral estoppel effect.

Three months later, on July 31, 2012, the district court denied in part Chevron's motion, finding genuine disputes as to the collateral estoppel defense. *Donziger*, 886 F. Supp. 2d at 292.[8]  The court's detailed ruling also rejected Defendants' "mootness" argument, finding they had sufficiently asserted defenses based on the Lago Agrio judgment.  The court relied on the text of the answers (which referred to and quoted from the Lago Agrio judgment and no other), Defendants' prior statements to the court and other U.S. courts asserting the supposed preclusive effect of the Lago Agrio judgment, and the absence of any other judgment that could plausibly have collateral estoppel effect here.  *See id*. at 265–71.[9]

2. <u>Denial of the LAPs' Motion to Amend Answer</u>.  On August 1, 2012, the LAPs sought leave to file an amended answer to "withdraw the defense of collateral estoppel with prejudice to reassertion in this action."  A1493.  The district court exercised its broad discretion to deny this motion on November 27, 2012,

---

[8]  The court granted the motion as to Defendants' res judicata defenses, however, explaining that the Ecuadorian courts had reserved Chevron's right to maintain RICO and fraud claims in the U.S.  *Donziger*, 886 F. Supp. 2d at 292 (relying on "the [Ecuadorian] appellate court's statement that it was 'preserving . . . [Chevron's] rights to . . . continue . . . the actions that have been filed in the United States'").  Defendants do not challenge this ruling here.

[9]  Although the LAPs now ask the Court to vacate this ruling, when it issued their spokesperson praised it as showing that "fraud hasn't been proven and the Ecuador judgment can be enforced."  Dkt. 58-10.  She claimed it was "yet another rebuke to the oil giant's fabricated fraud charges."  Dkt. 58-11.

finding that the attempted withdrawal was untimely and amounted to bad faith and prejudicial forum shopping, in that Defendants had invoked the preclusive effect of the Lago Agrio judgment in this case, but were now seeking to withdraw it here while preserving it "in every other court" in the U.S. (and elsewhere). *Donziger*, 886 F. Supp. 2d at 276; A1548–49.

3. Order Striking Unauthorized Amended Answers.  Two months later, on January 22, 2013, Defendants filed amended answers in defiance of the court's November 27, 2012 ruling and Rule 15, withdrawing the collateral estoppel and res judicata defenses to the extent they were based on the Lago Agrio judgment.  On February 20, 2013, the court struck the unauthorized amended answers.  A1714.

4. Order Denying Certification of Interlocutory Appeal.  The LAPs moved for judgment on the pleadings, and in November 2012 the district court dismissed Chevron's claims against the LAPs other than its third-party fraud and conspiracy claims.  A1547.  On January 7, 2013, the court denied the LAPs' subsequent request for certification of an interlocutory appeal of that order under 28 U.S.C. § 1292(b).  A1596.  In explaining why one of the LAPs' proffered questions for appeal—"whether a foreign judgment debtor may bring an affirmative common-law fraud claim in New York against a judgment creditor based on alleged fraud in obtaining the judgment"—did not meet the criteria for § 1292(b) certification, the district court quoted the following language from this Court's opinion in *Gleason*:

18

"Relief from a final judgment may also be obtained at any time by way of an *independent action* to set aside a judgment for 'fraud upon the court.'"  860 F.2d at 558 (quoting Fed. R. Civ. P. 60) (emphasis in original); A1609 & n.37.

### b.    The District Court Has Fairly Managed the Litigation

As is to be expected in multi-billion dollar litigation, the parties have engaged in extensive motion and discovery practice beyond the four challenged rulings.  And many substantive orders have favored Defendants.  For example, the court denied Chevron's motion for a TRO and order of prejudgment attachment of Defendants' assets, including any proceeds obtained from enforcement of the judgment (RA256–61), and granted in part Donziger's motion to dismiss Chevron's complaint (RA405–59), which Defendants praised as a "devastating setback[]" for Chevron, "gutt[ing]" its fraud claims.  Dkt. 58-8 at 1–2.

On January 28, 2013—six months after the denial of Chevron's first summary judgment motion—Chevron again moved for summary judgment as to several issues in the litigation, including certain predicate acts underlying its RICO claim (wire fraud and mail fraud), and Defendants' collateral estoppel defenses based on the Lago Agrio judgment.  A1630.  Defendants again sought an extension of time to respond to Chevron's arguments and extensive evidence, asking the court to "adjourn[]" Defendants' response date for three months, until after the close of discovery.  RA737–39.  The court extended Defendants' deadline to

19

March 18, 2013.  RA781.  On April 24, 2013, the court denied Chevron's motion, without prejudice to renewal after the close of discovery.  RA957.

The court has also held multiple hearings on discovery issues and made numerous discovery rulings, many favoring Defendants.  For instance, the court granted the LAPs' motion for a protective order prohibiting Chevron from enforcing certain subpoenas (A1628–29), denied Chevron's motion for leave to serve a document subpoena after the close of written discovery (RA956), granted in part the LAPs' motion to compel Chevron to produce documents related to its private investigators (RA1107–17), and denied Chevron's motion to quash the deposition of its CEO, John Watson (RA1039–40)—which Defendants trumpeted as "karmic justice," "the ultimate CEO-humiliation," and a great "victory."  Exs. 9–12.[10]

Since filing this petition, Defendants have engaged in yet another calculated effort to delay resolution of Chevron's RICO and fraud claims on the merits—this

---

[10]  For their part, Defendants have attempted to "resist[] discovery to an astonishing degree."  RA740.  Among other acts, Defendants orchestrated "a secret and collusive Ecuadorian lawsuit to obtain a court order barring their Ecuadorian agents from complying with document discovery requests."  RA741.  At the suggestion of their U.S. counsel, and with no notice to Chevron or the district court, Defendants arranged for one of the LAPs who has refused to appear in this action to file a lawsuit seeking to enjoin Pablo Fajardo (the LAPs' lead Ecuadorian lawyer) from complying with the district court's discovery orders.  RA794–95.  Fajardo mounted no opposition at the hearing, and as planned the Ecuadorian court ordered the LAPs' counsel not to deliver any information to the district court.  RA795.  In response to Defendants' obstruction, Chevron sought sanctions in March 2013 (RA783), and the district court held three days of evidentiary hearings to allow Defendants and their counsel to show that their conduct was proper, but they failed to do so.  The district court has not yet issued any sanctions.

time by coordinating the simultaneous withdrawal of some counsel in the action below, purportedly due to unpaid legal bills. RA1046. Although Donziger's prior counsel assured the district court that withdrawal "would not unduly disrupt the existing case schedule" (RA970–71), it has become clear the "withdrawal" was a public relations maneuver intended to delay the trial. Donziger leveraged the withdrawal into a temporary stay of depositions and a month-long extension of the discovery schedule (RA1054–56), and his subsequent request for an additional three-month stay of all proceedings is pending (RA1057). Yet the LAPs' lead Ecuadorian counsel has since admitted that the withdrawals were a strategic choice as resources are "scal[ed] back in New York to focus on the main issue: enforcing the $19 billion judgment around the world." RA1037. Defendants continue to be assisted by the same counsel who withdrew, one of whom appeared on behalf of Donziger in this Court *after* withdrawing below. *See* Ex. 13; RA1076–77.[11]

---

[11] Defendants' roster of lawyers numbers more than 100, from at least 21 different law firms—working in New York and other venues. *See* Dkt. 59, Ex. 1. Patton Boggs also continues as counsel of record to the LAPs in multiple venues, including before this Court, and is still working behind the scenes in the action below (Dkt. 82-3 at 20–21). In fact, one of Defendants' lawyers recently denied they were short of funds and boasted they had "one of the most powerful teams of litigators ever assembled." RA975–76. Donziger also has a $1 billion interest in the Lago Agrio judgment. *See* RA243–55. And an Ecuadorian court recently purported to freeze $96 million in Chevron assets (the amount that an arbitral tribunal had ordered Ecuador to pay Chevron in an unrelated arbitration), and Defendants claim that they intend to use this money "to hire teams of lawyers around the world to target Chevron assets to collect the full amount of the judgment." Ex. 10 at 2.

## REASONS FOR DENYING THE WRIT

Defendants ask this Court to issue a writ of mandamus to vacate four discretionary rulings that the district court issued in the past year—three of which rejected Defendants' bad-faith attempts to withdraw their collateral estoppel and res judicata defenses based on the Lago Agrio judgment, and a fourth that denied the LAPs' request for an interlocutory appeal of an order denying them judgment on the pleadings of Chevron's fraud claim.  But mandamus is "'reserved for really extraordinary causes,'" and Defendants come nowhere close to establishing their entitlement to this "drastic" remedy.  *Cheney*, 542 U.S. at 380.  The requirements for mandamus are stringent:  (1) "the party seeking issuance of the writ must have no other adequate means to attain the relief it desires"; (2) "the petitioner must demonstrate that the right of issuance of the writ is clear and indisputable"; and (3) "the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances."  *SEC v. Rajaratnam*, 622 F.3d 159, 169 (2d Cir. 2010).  Defendants do not acknowledge these requirements, much less try to satisfy them.

## A.    Defendants Have Other Means to Obtain the Desired Relief and Their Petition Is Untimely

It is well settled that the types of orders Defendants challenge here are all properly corrected by appeal from a final judgment, and the adequacy of a later appellate remedy is an absolute bar to mandamus.  *See, e.g.*, *Will v. United States*,

389 U.S. 90, 97 (1967) ("Mandamus, of course, may never be employed as a sub-
stitute for appeal . . . ."); *accord Kerr v. U.S. Dist. Court*, 426 U.S. 394, 403
(1976).  This rule applies even where "hardship may result from delay and perhaps
unnecessary trial."  *Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379, 383 (1953).
Moreover, "the inherent costs of litigation" cannot justify a writ of mandamus.
*Commc'n Workers of Am., AFL-CIO v. AT&T Co.*, 932 F.2d 199, 210 (3d Cir.
1991).  Where "[a]ppeal would lie from a final judgment . . . mandamus thwart[s]
the congressional policy against piecemeal appeals."  *United States v. Fein*, 504
F.2d 1170, 1177 n.8 (2d Cir. 1974).  Nothing distinguishes the orders challenged
here from the thousands of orders issued every year that losing litigants would
happily appeal piecemeal if—contrary to the law—they were so permitted.

- **The July 31, 2012 order (*Donziger*, 886 F. Supp. 2d at 292) largely deny-
  ing Chevron's motion for summary judgment.**  Pet. at 4–5, 15–17.  It is
  well settled that any error in a district court's disposition of a summary
  judgment motion can be remedied on appeal.  *See Rodriguez v. Lockheed
  Martin Corp.*, 627 F.3d 1259, 1267 (9th Cir. 2010) (denying writ petition
  seeking review of summary judgment ruling); *In re Life Investors Ins. Co. of
  Am.*, 589 F.3d 319, 326 (6th Cir. 2009) (same).

- **The November 27, 2012 discretionary order (A1548) denying the LAPs'
  motion for leave to amend their answer.**  Pet. at 5, 19–20.  This Court has
  expressly "decline[d]" to use mandamus to "interfere or oversee the step by
  step pleading progress of the parties" because "'[p]ossible error in allowing
  or denying an amendment is not normally reviewable by mandamus or other
  extraordinary writ; the remedy is by way of appeal when a final judgment
  has been entered.'"  *D'Ippolito*, 374 F.2d at 648 (citation omitted); *see also
  Kahn v. Chase Manhattan Bank, N.A.*, 91 F.3d 385, 388–89 (2d Cir. 1996).[12]

---

[12]  In *Richardson Greenshields Sec., Inc. v. Lau*, 825 F.2d 647 (2d Cir. 1987), this

- **The February 20, 2013 discretionary order (A1714) granting Chevron's motion to strike the amended answers after leave to amend was denied.** Pet. at 5, 19 n.30.  Defendants effectively seek the same relief as with the November 27 decision, and, again, a post-judgment appeal is adequate.  *See, e.g.*, *In re Brown*, 174 F. App'x 78, 78–79 (3d Cir. 2006) (per curiam) (declining to review order on motion to strike via mandamus); *In re Schneider*, No. 573, 1999 WL 173251, at *1 (Fed. Cir. Jan. 21, 1999) (same).

- **The January 7, 2013 discretionary order (A1596) declining to certify for interlocutory appeal the denial of the LAPs' motion for judgment on the pleadings vis-à-vis Chevron's fraud claim.**  Pet. at 5, 21–27.  The *only* adequate remedy for denial of certification under 28 U.S.C. § 1292(b) is a post-judgment appeal, because the contrary would be "in plain violation of the Congressional purpose that such appeals should be heard only when both the courts concerned so desire."  *D'Ippolito*, 374 F.2d at 649.

Moreover, Defendants' substantial delay counsels against writ relief.  The summary judgment order issued at the end of July 2012—more than eight months before Defendants filed their petition.  At a minimum, they could have filed this petition after denial of their motion for leave to amend in November 2012.  Yet Defendants offer no explanation for this delay—and indeed it appears they have brought the petition now as part of their trial-disruption strategy—which invites its denial.  *See, e.g.*, *Chapman v. Bd. of Cnty. Comm'rs*, 107 U.S. 348, 355 (1883).[13]

---

Court issued a writ of mandamus where the trial court "effectively prevented [a party] from filing a motion" "authorized by the Federal Rules of Civil Procedure" by imposing a pre-filing conference requirement and then failing to hold a timely conference at a party's request.  *Id.* at 652.  *Lau* has no bearing in these circumstances, where Defendants moved to amend and the district court exercised its broad discretion to deny the amendment.

[13]  To the extent Defendants are really complaining about a ruling that they believe the district court may issue in the future—namely, "a declaration on the validity of the Judgment before the Argentine, Brazilian, or Canadian courts get the chance

**B.    Defendants Have No "Clear and Indisputable" Right to Writ Relief**

**1.    The District Court Has Fully Carried Out the *Naranjo* Mandate**

The district court fully complied with the *Naranjo* mandate in the only case in which it was issued, dismissing Chevron's DJA action "in its entirety" on February 21, 2012.  A1275.  Defendants' assertion that "[t]he district court has thumbed its nose at the [*Naranjo*] Mandate" (Pet. at 30) rests on a mischaracterization of the record below and a misreading of *Naranjo*—which did not and cannot control Chevron's separate RICO and fraud action.

A mandate "requires a trial court to follow an appellate court's previous ruling on an issue in the same case." *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002).  This is because the mandate "describes the duty of the district court on remand." *United States v. Tenzer*, 213 F.3d 34, 40 (2d Cir. 2000).  This "same case" limitation is what distinguishes a violation of a mandate from mere error in the application of caselaw correctable on appeal from a final judgment.  This forecloses Defendants' request for mandamus relief.  Each of the orders Defendants challenge was entered in Chevron's RICO and fraud action, *Donziger*, No. 11-cv-0691 (S.D.N.Y.), and *Naranjo* resolved only Chevron's separate DJA

---

to" (Pet. at 32)—such a ruling, were it sought and granted, would also be reviewable on appeal from a full record.  Courts do not issue the extraordinary remedy of mandamus to preempt a ruling a party believes the district court *might* issue at some point the future.  *See, e.g.*, *Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp.*, 920 F.2d 1127, 1134 (3d Cir. 1990) ("We decline to pursue the extraordinary remedy of mandamus in order to issue such an advisory opinion.").

action, No. 11-cv-3718 (S.D.N.Y.).  It resolved that case "completely," and left "nothing further to be addressed on remand."  *Naranjo*, 667 F.3d at 239 n.11; *see also E.S. v. Indep. Sch. Dist., No. 196 Rosemount-Apple Valley*, 135 F.3d 566, 568 (8th Cir. 1998) (a severed claim "proceeds as a discrete, independent action").

No authority supports Defendants' expansive reading of the *Naranjo* mandate to govern orders entered in a separate case, because "a mandate is controlling only as to matters within its compass," *N. Eng. Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*, 352 F.3d 599, 606 (2d Cir. 2003) (quotation marks omitted), which extends no further than the action in which it issues.  In each of the cases Defendants cite, the appellate court granted mandamus to vacate rulings that a district court had entered on remand *in the same action*.[14]

---

[14]  *See In re FCC*, 217 F.3d 125, 129–33 (2d Cir. 2000) (prior appeal reversed the judgment in a bankruptcy adversary proceeding; mandamus proceeding concerned the district judge's disposition on remand of a show-cause motion filed in the same bankruptcy); *In re Cont'l Ill. Sec. Litig.*, 985 F.2d 867, 869 (7th Cir. 1993) (prior appeal vacated an award of attorneys' fees; mandamus proceeding concerned district judge's refusal on remand to use the fee-calculation method ordered by the court of appeals); *Yablonksi v. United Mine Workers of Am.*, 454 F.2d 1036, 1039–40 (D.C. Cir. 1971) (per curiam) (prior appeal disqualified counsel; mandamus proceeding concerned the district judge's refusal on remand to disqualify substitute counsel); *In re MidAm. Energy Co.*, 286 F.3d 483, 485–86 (8th Cir. 2002) (per curiam) (prior appeal reversed summary judgment grant and dismissed a claim; mandamus proceeding concerned district judge's attempt on remand to allow plaintiff to amend complaint to revive the dismissed claim); *Delgrosso v. Spang & Co.*, 903 F.2d 234, 235–37 (3d Cir. 1990) (prior appeal reversed summary judgment grant and ordered the district court to formulate equitable relief; mandamus proceeding concerned district judge's refusal on remand to formulate equitable relief).

**2.    The Motion for Summary Judgment Complies With *Naranjo* Because Defendants Put Recognition of the Judgment at Issue**

Defendants challenge the July 31, 2012 order, which largely denied Chevron's motion for summary judgment on Defendants' res judicata and collateral estoppel defenses.  This order is of a type that is adequately reviewed on appeal from a final judgment, and Defendants' challenge comes far too late in the day for mandamus.  In addition, *Naranjo* noted that a plaintiff who is also a judgment debtor may challenge the recognizability of a foreign judgment if a judgment creditor invokes the judgment "in a pending action by . . . affirmative defense."  *Naranjo*, 667 F.3d at 241 (quoting N.Y. C.P.L.R. § 5303).  That is what occurred here.

**a.    Defendants put the judgment at issue.**  Defendants' answers asserted the affirmative defenses of res judicata and collateral estoppel (A1169; RA234), and Defendants admitted in the district court that if these defenses invoked the Lago Agrio judgment (which they did), then they raised the issue of the judgment's entitlement to comity or recognition under applicable federal or state law.  *See* A1367 (conceding "New York law would require Defendants to show that the Judgment is entitled to recognition under the New York Recognition Act in order to invoke res judicata or collateral estoppel"); *see also Alfadda v. Fenn*, 966 F. Supp. 1317, 1325 (S.D.N.Y. 1997) (only recognizable foreign judgments have preclusive effect).  Defendants now argue their estoppel defenses "really" sought to invoke some other unspecified judgment, *not* the Lago Agrio judgment—and that

27

any contrary assertion could be based only on "Chevron's self-serving interpretation of the LAPs' boilerplate estoppel defense." Pet. at 5. But Defendants' attempted repudiation of their own answers is untenable.

First, the only judgment mentioned in Defendants' answers is the Lago Agrio judgment.[15] In fact, Donziger affirmatively alleged that "Chevron's claims are barred, in whole or in part, by the doctrine of international comity" and "because the Ecuadorian judgment in the [*Lago Agrio*] case was rendered through regular proceedings conducted under a system that provides impartial tribunals and procedures compatible with due process." RA236. Defendants did not identify, or even allude to, any other judgment anywhere in their pleadings. The district court in its discretion was entitled to conclude that this "clearly demonstrate[s]" that their answers were "intended to plead that the Ecuadorian Judgment [w]as *res judicata* and collateral estoppel." *Donziger*, 886 F. Supp. 2d at 266. Moreover, Defendants' opposition to Chevron's March 2012 summary judgment motion did not specifically name any other judgment, *see* A1366, and they have never identified another judgment that could plausibly give rise to res judicata or collateral estoppel defenses to Chevron's claims below. Defendants' post-hoc insistence that they had "always" intended to invoke some other judgment is therefore "completely unsub-

---

[15] *See* A1170 (asserting that Chevron's claims were barred because the Lago Agrio judgment was "not yet final"); A1171 (asserting that Chevron's claims were barred because the Lago Agrio judgment "was not obtained by fraud"); A1166 (quoting the Lago Agrio judgment in "unclean hands" defense); RA235–36.

stantiated in their answer[] and entirely unpersuasive." *Donziger*, 886 F. Supp. 2d at 268. Labeling their own pleaded defense "boilerplate" because they now find it inconvenient is not convincing, much less conclusive.

Second, apart from their answers, Defendants have expressly, and repeatedly, sought to invoke the purported preclusive effect of the Lago Agrio judgment in both the district court and in this Court. For example, the LAPs argued to this Court in *Naranjo* that because "Chevron litigated (and still is litigating) the same fraud claims in Ecuador . . . [p]rinciples of estoppel should preclude Chevron from re-litigating its fraud claims in the lower court." A980 & n.33; *see also* Ex. 14 at 18 (LAPs' motion opposition brief in *Naranjo*: "[A]ll of Chevron's claims [of fraud] have been presented to and addressed by the Ecuadorian Trial and Appellate Courts"). Likewise, the LAPs argued in the district court:

> As the Lago Agrio court was presented with much of the same discovery Chevron presents here . . . but rejected Chevron's repeated requests to nullify the judgment on the basis of a purported fraud, Chevron should be estopped from arguing that the Ecuadorian Plaintiffs' contacts with Cabrera show "probable cause" of a crime or fraud.

Ex. 15 at 21; *see also* RA393–404 (chart of Defendants' assertions of the Lago Agrio judgment's preclusive effect, including in the action below after *Naranjo*).[16]

---

[16]   Ironically, even in petitioning this Court now, Defendants argue that the Lago Agrio judgment should preclude Chevron's fraud allegations. They stress that the Ecuadorian trial court "examined and rejected Chevron's request to set aside the opinions and conclusions of expert reports that Chevron claimed were tainted by fraud," and suggest that this Court need not credit Chevron's evidence because the

Third, although Defendants now claim Chevron "ambushed" them (Pet. at 15 & nn.24–25) by moving for summary judgment of their defenses on the ground that the Lago Agrio judgment was not entitled to recognition "under federal or New York law" (A1308),[17] Defendants' initial response to this "ambush" was not to disclaim reliance on the Lago Agrio judgment. To the contrary, Defendants initially moved to strike Chevron's motion as "premature[]" (RA372), and they then requested (and received) more time to respond on the merits to Chevron's arguments and "thousands of pages of exhibits" (RA461). Defendants' conduct was "consistent only with an understanding that the *res judicata*-collateral estoppel defense was based on the [Lago Agrio] Judgment, as Chevron's motion goes only to that question." *Donziger*, 886 F. Supp. 2d at 267.[18]

In light of this record, it is neither credible nor realistic for Defendants to argue that they never intended to raise the Lago Agrio judgment—and its rejection of several of Chevron's fraud allegations—as a defense to this action. Thus, the district court concluded in its July 31, 2012 order denying Chevron's motion for summary judgment that Defendants invoked the Lago Agrio judgment as the basis

---

Ecuadorian appellate court "rejected Chevron's claims of fraud." Pet. at 8–9.

[17] This Court in *Naranjo* limited its analysis to New York's Recognition Act, and did not discuss federal judgment comity or recognition principles.

[18] That Defendants ultimately adopted a different strategy and elected not to respond on the merits, *see* A1368, does not change the fact that they initially recognized that Chevron's interpretation of their pleaded defenses was correct.

for their collateral estoppel and res judicata defenses. *Id.* at 271.[19]  Defendants do

not assign error to any of the court's reasons for reaching this conclusion, and no

other judgment could plausibly be argued to preclude Chevron's RICO and fraud

claims. *Id.* at 268–70; *see also* RA389–90.

> **b.** **The district court may rule on issues *Naranjo* left open.**  It is well

settled that the scope of a mandate is "limited to matters actually decided." *In re

Sterling-Suarez*, 323 F.3d 1, 2 (1st Cir. 2003); *accord N. Eng. Ins. Co.*, 352 F.3d at

606.  An appellate court's mandate thus "has no applicability" where "this Court

did not rule on the question" in the prior proceeding. *United States v. Uccio*, 940

F.2d 753, 757 (2d Cir. 1991).  As a consequence, a district court's resolution of

"[q]uestions . . . not resolved in the [prior] proceeding . . . cannot violate [the ap-

pellate court's] prior order." *In re Sterling-Suarez*, 323 F.3d at 2.

Chevron has not sought any sort of "declaration of non-recognition" in the

underlying action, much less pursued a cause of action under the DJA or the

Recognition Act, and there is no "game afoot" in which Chevron has asked the dis-

---

[19]  Defendants claim that Chevron—the appellee in *Naranjo*—"withheld" from
this Court the argument that Defendants' collateral estoppel defense was an "alter-
native ground[] for a non-recognition declaration" so as "to give itself and the dis-
trict court another bite at the apple when the LAPs may not appeal as of right."
Pet. at 15 n.25.  This is false:  *Naranjo* involved a preliminary injunction the dis-
trict court issued pursuant to Chevron's DJA claim, 667 F.3d at 238 n.8, and De-
fendants' affirmative defenses to Chevron's RICO and fraud claims were not (and
could not have been) at issue in *Naranjo*.  Moreover, Defendants do not and cannot
contend that an affirmative defense pleaded to the DJA claim would have some-
how remedied the threshold infirmities this Court identified with that claim.

trict court to issue a ruling that would usurp any foreign court's jurisdiction.  Pet. at

6, 17.  Yet Defendants would have this Court, relying on *Naranjo*, order the district

court to "refrain, *in any context*, from considering whether the Judgment is entitled

to recognition."  Pet. at 5.  *Naranjo* does not preclude the district court from reach-

ing questions or facts relevant to claims or defenses properly before the court, even

if those questions or facts are also shared with the recognition analysis.  The nature

of Defendants' misconduct, and thus the nature of Chevron's claims, necessarily

implicates many of the same factual issues raised by the recognition inquiry.

The Lago Agrio judgment is a key component of Defendants and their

agents' overarching scheme to extort Chevron.  And the process by which Defend-

ants obtained that judgment is necessarily at issue by virtue of Chevron's RICO

and fraud claims below—regardless of whether the question is labeled one of

"recognition" and irrespective of whether Defendants seek to enforce the judgment

or invoke it as an affirmative defense.  Indeed, Defendants' attempt to withdraw

their assertion that the judgment is preclusive in this action is obvious gamesman-

ship given the prominence, in Chevron's claims, of Defendants' fraudulent pro-

curement of that judgment.  *Naranjo*'s analysis of the Recognition Act and the

DJA can have no bearing on Chevron's ability to adjudicate its rights and litigate

its RICO and other claims below, including issues that go to the legitimacy of the

Lago Agrio judgment.  Regardless of whether Defendants' affirmative defenses are

in or out of the case, the corrupt process by which Defendants obtained their Ecuadorian judgment is a part of Chevron's RICO and fraud claims.

While this Court expressed concern in *Naranjo* that New York courts not become "transnational arbiter[s]" of foreign judgments (667 F.3d at 242), it should be equally unwilling to disable New York courts from fully adjudicating fraud and racketeering claims where the challenged conduct involved, in part, the corruption of a foreign court by U.S. actors, against a U.S. victim. If Chevron prevails on these claims, then the district court may award Chevron whatever relief it is entitled to under the law, but this has not yet happened and may never happen. *See, e.g.*, *Allegheny Int'l*, 920 F.2d at 1134.

Finally, because "[c]onsiderations of international comity" factored into this Court's construction of the Recognition Act in *Naranjo*, *see* 667 F.3d at 242, it bears noting that the Ecuadorian court of appeals has itself purported to defer to the district court below with respect to adjudicating Defendants' fraud. When it affirmed the $18.2 billion judgment it refused to consider Chevron's extensive evidence of fraud in part because

> the same accusations are pending resolution before authorities of the United States of America due to a complaint that has been filed by . . . Chevron, under what is known as the RICO act, and this Chamber has no competence to rule on the conduct of counsel, experts or other officials or administrators and auxiliaries of justice . . . .

A1330. Although the Ecuadorian appellate court subsequently claimed it had "re-

viewed" some of the fraud evidence, it reaffirmed its decision to "stay[] out of these accusations, preserving the parties' rights to . . . continue the course of the actions that have been filed in the United States of America."  A1356.[20]

### 3.    Mandamus Cannot Lie for Denial of Defendants' Attempts to Withdraw Their Affirmative Defenses

Defendants also seek mandamus on the ground that the district court refused to allow them to *withdraw* their estoppel-based affirmative defenses based on the Lago Agrio judgment.  *See* Pet. at 16–17, 19–20.  Whether to allow amendment of a pleading is a discretionary determination.  *See, e.g.*, *Williams v. Citigroup, Inc.*, 659 F.3d 209, 213–14 (2d Cir. 2011).  A strong presumption exists against the issuance of mandamus when the writ would set aside a lower court's discretionary determination.  *See, e.g.*, *Donlon Indus., Inc. v. Forte*, 402 F.2d 935, 937 (2d Cir. 1968) (Friendly, C.J.); *In re Deutsche Bank Trust Co. of Am.*, 605 F.3d 1373, 1377 (Fed. Cir. 2010).  To obtain mandamus relief, Defendants would have to show that the district court committed an unusually egregious abuse of discretion in denying leave to amend.  *See Linde v. Arab Bank, PLC*, 706 F.3d 92, 109 (2d Cir. 2013) ("A suggestion that the district court abused its discretion, which might warrant re-

---

[20]  Nor are there any comity concerns as to Defendants' enforcement actions.  Argentina's Supreme Court held that an Ecuadorian order attaching assets of Chevron's indirect Argentine and Danish subsidiaries "violat[ed] the principles of Argentine international public policy."  Ex. 2 at 4.  And a Canadian court found that the LAPs "ha[d] no hope of success in their assertion that the corporate veil . . . should be pierced and ignored."  RA1018; RA1010.  A ruling is pending in Brazil.

versal on a direct appeal, is not a sufficient showing to justify mandamus relief."
(citation and quotation marks omitted)).  But Defendants have failed to show even
an ordinary abuse of discretion in the district court's refusal to permit withdrawal.
*See D'Ippolito*, 374 F.2d at 648; *Kahn*, 91 F.3d at 388–89.

Defendants attempted to withdraw their defenses only after Chevron filed its
summary judgment motion challenging them.  Defendants did so, first, by adopting
a so-called stipulation they had submitted to the district court in the DJA action.
That "stipulation" purported to disclaim any present intent to seek recognition of
the Lago Agrio judgment in a New York court.  *See* Pet. at 16; *see also* A1369–71.
But the stipulation says nothing about attempting to invoke the preclusive effect of
the judgment as part of an affirmative defense, and thus begs the question.

Further, in its July 31, 2012 ruling, the district court found the stipulation
was "without legal effect."  *Donziger*, 886 F. Supp. 2d at 274.  Defendants do not
challenge this finding (and even if they did, their petition would be far too late, *see,
e.g.*, *Chapman*, 107 U.S. at 355).  Moreover, the district court did not abuse its dis-
cretion because an agreement is binding only if reciprocal.  *See* Restatement (Se-
cond) of Contracts § 3.  The "stipulation" was nothing more than a "unilateral dec-
laration" and therefore "does not even bind the [Defendants] themselves."
*Donziger*, 886 F. Supp. 2d at 271; *accord Standard Fire Ins. Co. v. Knowles*, 133
S. Ct. 1345, 1348 (2013) ("Stipulations must be binding" to have legal effect).

The district court also concluded that the "stipulation" was ineffective because it was, in substance, an attempt by Defendants to amend their answers without the court's leave or Chevron's consent, in violation of Rule 15(a)(2). *See Donziger*, 886 F. Supp. 2d at 275. Even if Defendants had properly sought leave to amend under Rule 15(a)(2), the court explained, it would have denied leave because the proposed amendment followed a period of undue delay, reflected bad faith, and would prejudice Chevron. *Id.* at 276.

Defendants do not challenge the district court's finding of undue delay—*i.e.*, that Defendants "easily could have attempted precisely the same tactic months earlier than they did." *Id.* This alone warrants denial of the petition. *See State Trading Corp. of India v. Assuranceforeningen Skuld*, 921 F.2d 409, 418 (2d Cir. 1990) (affirming denial of leave to amend based on undue delay and bad faith, without mentioning unfair prejudice). In any event, in weighing the "prejudice" that would result from an amended pleading, courts consider not only the "injustice resulting to the party opposing the motion should it be granted [here, Chevron]," but also "the reasons . . . the moving party failed to include the material to be added in the original pleading." Charles Alan Wright, et al., *Federal Practice & Procedure* § 1487 (3d ed. 2013). Defendants have never given any plausible reason for their strategic efforts to withdraw their defenses after having asserted them. The only reasonable conclusion is that they are seeking to avoid resolution of the defenses

on the merits, which is not a permissible ground. *See, e.g.*, *Reisner v. Gen. Motors Corp.*, 511 F. Supp. 1167, 1172 (S.D.N.Y. 1981) (proposing an amended pleading "as an attempt to forestall a ruling against the plaintiffs on a motion for summary judgment . . . would clearly justify denial of permission to file it").[21]

Further, the court properly found that allowing Defendants "to take the issue of recognizability and enforceability off the table in this case while preserving it in every other court in this and other nations would be to acquiesce in a blatant exercise in forum shopping." *Donziger*, 886 F. Supp. 2d at 275; *see also id.* at 268 n.209 ("[Defendants'] new position is in tension also with arguments they made in . . . [related] Section 1782(a) discovery matters, [where] they argued that certain findings by the Lago Agrio court should be given preclusive effect.").

The district court was not required to permit Defendants to play ducks and drakes with Chevron by withdrawing their estoppel defenses after having asserted them here, only to avoid what they believed would be an adverse ruling in these proceedings and to instead litigate the same issues elsewhere. A litigant cannot subject another party "to the cost and expense of litigation and then, if [that litigant] fears an unwanted result in which the action is pending, steal[] away only to

---

[21]  Defendants invoke "the liberal standard for amendment of pleadings." Pet. at 3. But the rationale for this liberality has no application here in the context of withdrawing a claim or defense once asserted: "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Williams*, 659 F.3d at 213.

file elsewhere." *Donziger*, 886 F. Supp. 2d at 277 (analogizing to Fed. R. Civ. P.

41). Indeed, it is well settled that courts may exercise their discretion to deny leave

to amend where, as here, the proposed amendment reflects a tactical, bad-faith liti-

gation decision. *See Furguson v. Roberts*, 11 F.3d 696, 707 (7th Cir. 1993) (leave

to amend denied where it was "a tactic . . . to postpone the trial date"); *Assurance-*

*foreningen Skuld*, 921 F.2d at 418 (finding "lack of good faith" and denying "tacti-

cal" motion to amend); *Rotter v. Leahy*, 93 F. Supp. 2d 487, 496 (S.D.N.Y. 2000)

("[B]ad faith is, in and of itself, reason to deny [a] motion [to amend].").

Given the ample bases supporting the July 31, 2012 order, Defendants' re-

maining complaints about the district court's subsequent treatment of their preclu-

sion defenses fall away. The November 27, 2012 order denying the LAPs' motion

for leave to amend their answer incorporated and is supported by "all the reasons

stated in [the court's July 31, 2012] opinion." A1548. And like the July 31, 2012

order, it is far too late for Defendants to challenge it by mandamus now. As for the

February 20, 2013 order striking the LAPs' unauthorized amended answer, De-

fendants also never explain why it merits mandamus. Nor could they, because the

LAPs filed unilaterally without obtaining leave of court or Chevron's consent, and

thus Rules 12(f) and 15(a)(2) authorized the district court to strike the amendment.

*See, e.g.*, *Murray v. Archambo*, 132 F.3d 609, 612 (10th Cir. 1998); Charles Alan

Wright, et al., *Federal Practice & Procedure* § 1484 (3d ed. 2013).

In sum, Defendants' decision to invoke the Lago Agrio judgment offensively below and in related actions in other federal courts is separate from their rights as judgment creditors to select an *enforcement* forum of their choosing. Contrary to Defendants' claims, the district court is not "forcing the LAPs to litigate the *enforceability* of the Judgment in New York." Pet. at 30 (emphasis added). As a result, *Naranjo* has no bearing on the district court's discretionary conclusion that Defendants were engaging in bad-faith forum shopping by continuing to invoke the judgment's preclusive effect before other U.S. courts but attempting to withdraw that argument from this case for no purpose other than "avoiding what [they] evidently fear[ed] would be an adverse result." *Donziger*, 886 F. Supp. 2d at 276.[22]

### 4. The District Court's 28 U.S.C. § 1292(b) Denial Cannot Form the Basis for Mandamus and Did Not "Manufacture" a New "Claim"

Defendants also claim that the district court's order denying the LAPs' 28

---

[22] Defendants try to draw a parallel between the district court's rejection of the their efforts to withdraw their assertion of the Ecuadorian judgment's supposed preclusive effect, on the one hand, and Chevron's clarification of a handful of references in its complaint to "sham litigation," on the other. *See* Pet. at 17–19. This analogy fails for several reasons. Unlike Defendants' repeated invocation of the preclusive effect of the Ecuadorian judgment before this Court and other courts, Chevron has not put at issue the environmental conditions in Ecuador through its use of the descriptive term "sham litigation" in its complaint. And Chevron has explained what the term means in the context of this litigation (A1613), unlike Defendants, who can only disown their own pleading as meaningless "boilerplate." Defendants' numerous references to the environmental conditions in Ecuador are not only wildly inaccurate—they are irrelevant. Even assuming for the sake of argument that TexPet were responsible for some unremediated environmental harm in Ecuador, this would not authorize Defendants' fraud and criminal misconduct— nor would it prevent Chevron from pursuing its claims against Defendants here.

U.S.C. § 1292(b) petition created an independent, unpleaded claim to "set aside" the Lago Agrio judgment under Rule 60(d), which, they argue, is the "functional equivalent" of the declaratory judgment claim ordered dismissed in *Naranjo*.  Pet. at 6.  This Court has been clear that a § 1292(b) denial order cannot form the basis for mandamus.  *D'Ippolito*, 374 F.2d at 649.  In any event, Defendants are distorting the record in an attempt to manufacture an issue for mandamus.

On November 27, 2012, the district court granted in part and denied in part the LAPs' motion for judgment on the pleadings.  A1547.  Although they do not expressly challenge that ruling here, Defendants contend the district court ignored "controlling Circuit precedent" when it held Chevron could pursue a fraud claim premised on third-party reliance.  Pet. at 22–23.  Yet "the New York Court of Appeals has held not once, but three times, that a claim for common law fraud may rest on third-party reliance."  RA447 (collecting cases).  Moreover, recent New York Appellate Division decisions make clear that under New York law, "fraud may be found 'where a false representation is made to a third party, resulting in injury to the plaintiff.'"  *Litvinov v. Hodson*, 905 N.Y.S.2d 400, 401 (N.Y. App. Div. 2010) (citation omitted).  While this Court had adopted a contrary view in prior decisions, it has never addressed these New York appellate cases, and *Litvinov* was decided *after* this Court's most recent published decision on this issue, *City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425 (2d Cir. 2008), *rev'd sub nom.*

40

*Hemi Grp., LLC v. City of New York*, 559 U.S. 1 (2010). And two other district courts in this Circuit have recently agreed with the district court's analysis of New York law. *See My First Shades v. Baby Blanket Suncare*, No. 08-CV-4599 MKB, 2012 WL 6675118, at *11 (E.D.N.Y. Dec. 21, 2012); *Prestige Builder & Mgmt. LLC v. Safeco Ins. Co. of Am.*, 896 F. Supp. 2d 198, 205 (E.D.N.Y. Oct. 10, 2012).

Following the denial of their motion for judgment on the pleadings, the LAPs asked the district court to certify for interlocutory appeal under 28 U.S.C. § 1292(b) two questions, only the second of which is relevant here: "[W]hether a foreign judgment debtor may bring an affirmative common-law fraud claim in New York against a judgment creditor based on alleged fraud in obtaining a foreign judgment." A1606. The LAPs claimed this was a matter of "first impression." *Id.* The district court exercised its broad discretion to deny certification. *See Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 24–25 (2d Cir. 1990).

The court found the LAPs' second question was not a controlling question of law for two reasons. First, Chevron's fraud claim is not based "entirely on the contention that the [LAPs] and/or their agents procured the Judgment by fraud," but also includes fraudulent statements to, among others, "U.S. courts, federal and state agencies and officials, Chevron's stockholders, persons in the investment arena, and journalists." A1606–07.[23] Second, the answer to this question was already

---

[23] For instance, the LAPs made material misrepresentations to Burford Capital

well established, contrary to the LAPs' contention that it was an issue of "first impression," in that "[r]elief for fraud in the procurement [of] a prior judgment long was available in independent actions in equity."  A1606–08.  To illustrate the absence of any "serious doubt" on this issue, the court gave as one example a hypothetical action under Rule 60(d) to "set aside" a judgment based on fraud.  *See* A1607–09.  The court's "set aside" language was contained within a direct quotation from this Court's opinion in *Gleason*, 860 F.2d at 558.  A1609 & n.37.

Defendants' assertion that the district court has "manufactured a claim—one that is nowhere to be found in Chevron's Complaint—to 'set aside' the Judgment" is thus based on a single stray reference to Rule 60(d) in dicta (quoting this Court) in a portion of an order denying the LAPs' request for leave to take a discretionary interlocutory appeal under § 1292(b).  Pet. at 3.  That ruling did not and could not "manufacture[]" a new claim.  Rather, the court merely recognized and discussed the undisputed historical practice of independent actions in equity to challenge fraudulent judgments, which has since been codified in part in Rule 60(d).

LLC in an effort to obtain funding for the Lago Agrio litigation.  These misrepresentations included assuring Burford that Cabrera was an independent court expert "akin to a US Special Master," and that "the contacts that had occurred between the LAPs and Cabrera were both limited and permissible."  RA936–39; RA942.  Relying upon these misrepresentations, Burford entered into a funding agreement with the LAPs and Patton Boggs for up to $15 million.  RA936–39; RA947.  When Burford discovered that the LAPs had misrepresented key facts to it, Burford terminated the funding agreement.  RA950.  Burford's CEO, Christopher Bogart, asserted that Burford would never have entered into the funding agreement were it not for the LAPs' misrepresentations.  RA942–43.

## THERE IS NO BASIS FOR REASSIGNMENT

Throughout this litigation, Defendants have had no response to the extensive evidence supporting Chevron's RICO and fraud claims—evidence that consists largely of Defendants' own internal documents and emails, videotaped admissions, and the sworn testimony of their former colleagues.  Instead, Defendants have resorted to attacking the well-respected district judge who has worked tirelessly to oversee this complex case.  They have sought his recusal or removal no fewer than six times.  *See* Pet. at 31–39; *Naranjo*, 667 F.3d at 239 n.11; *Naranjo*, 2011 WL 4375022, at *1; RA110; RA1118; RA1142.

For Defendants, seeking a litigation advantage through baseless attacks on judges is neither new nor limited to this district judge.  In the earlier *Aguinda* litigation, they sought recusal of Judge Rakoff for his purported bias after he ruled against them.  *In re Aguinda*, 241 F.3d 194, 197–98 (2d Cir. 2001) (denying writ); RA108 (Donziger claiming that Judge Rakoff was "corrupt" and "totally biased against us").  And in response to a series of rulings favoring Chevron, Defendants mocked the arbitral tribunal presiding over Chevron's action against the ROE as a "Kangaroo court."  Dkt. 58-12 at 1.  The record is also replete with examples of their efforts to—in their words—"intimidate," "pressure," and "humiliate" judges in Ecuador.  A1695.

Defendants continued this strategy of judicial intimidation from the moment

43

Chevron initiated this suit, hoping to derail the litigation by procuring the removal of a judge whom they feared would rule against them—because of his attention to detail and impartial assessment of the evidence, and for no other reason. Defendants and their agents have launched near-daily attacks on the district judge in court filings and in the media, accusing him of being "open . . . for Chevron's business," "at Chevron's beck and call," a "Chevron lackey," in a "conspiracy" with Chevron, "corrupt," "biased," "racist," and a "zealot[]." Dkts. 58-4 to 58-7; Exs. 9, 16. In fact, when the district judge sought a short extension from this Court to determine whether to respond to this petition, Defendants' PR machine twisted his modest request—which was granted—as "an act of chutzpah." Ex. 17 at 2.

Although Defendants lack any evidence of extrajudicial bias, *see Liteky v. United States*, 510 U.S. 540 (1994), they have nonetheless littered their petition with unfounded and outrageous charges.[24] The LAPs' prior writ petition seeking to remove the same district judge for the same reasons—which this Court summarily denied—also contained such inappropriate, over-the-top personal attacks.[25]

---

[24] *See, e.g.*, Pet. at 3–4 (court has "jumped through hoops" in order to "maximize the impact of its improper declaration"); *id.* at 6 (describing "the district court's calculated effort to evade this Court's Mandate and Opinion, inability to remain impartial, and hostility toward the ROE's judiciary and government"); *id.* at 16 (court engaged in "a litany of tortured justifications for refusing to allow the LAPs to be the masters of their own pleading"); *id.* at 24 (court "resort[ed] to judicial gymnastics to justify keeping these issues and the case out of this Court's hands").
[25] *See, e.g.*, A911 (Judge Kaplan is "Chevron's single greatest ally in its eighteen-year effort to evade liability"); A925 ("But, giving in to his biases, Judge Kaplan

This Court has sanctioned attorneys for similar improper filings. For example, in *Ransmeier v. Mariani*, Nos. 11-175-cv, 11-640-cv, --- F.3d ----, 2013 WL 1981939 (2d Cir. May 15, 2013), the Court sanctioned an attorney who engaged in a pattern of "targeting opponents and judges with rude language," filed briefs containing "an escalating series of *ad hominem* attacks on opposing counsel and bombastic challenges to the integrity of the district court," and advanced unsupported bias accusations that amounted to "little more than a series of offensive insinuations." *Id.* at *2–3 (quotation marks omitted). Indeed, in *Ransmeier*, this Court criticized "especially disdainful" language that was strikingly similar to that which Defendants have used here to attack the district court's actions. *Compare id.* at *3 n.2 (describing letter that accused the Clerk of Court of "thumbing its nose" at the appellant), *with* Pet. at 30 ("[T]he district court has thumbed its nose at the Mandate."). *See also Gallop v. Cheney*, 660 F.3d 580, 586 (2d Cir. 2011) (per curiam) (sanctioning counsel for accusing court of "a 'rank, dishonest wielding of ordained power' that 'would or should provoke a congressional investigation'").

Defendants again ask this Court to reassign this case to a different district judge. But reassignment is reserved for those "few" cases presenting "unusual cir-

---

would have none of the self-restraint exhibited by his peers."); A941 ("Judge Kaplan has toyed with the Ecuadorian Plaintiffs"); A949 ("Judge Kaplan devoured, without *any* perceptible scrutiny, every mischaracterization and half-truth that Chevron put before him" (emphasis in original)); A952 (case "must be purged of the black cloud of partiality which hangs over it").

cumstances." *United States v. Robin*, 553 F.2d 8, 10 (2d Cir. 1977) (en banc) (per curiam).  In determining whether to reassign a case to a different judge, "[a]bsent proof of personal bias requiring recusation," this Court considers:  "(1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *Id.* (citation omitted).  These factors weigh strongly against Defendants' request, which is premised on a false narrative.

Without a shred of evidence of "bias[]" (Pet. at 28), Defendants' *ad hominem* attacks on the district judge ascribe to him the most sinister motives for his actions in this case.  But as this Court recognized when it rejected Defendants' prior attempt to remove this same judge, "bias cannot be inferred from a mere pattern of rulings by a judicial officer, but requires evidence that the officer had it in for the party for reasons unrelated to the officer's view of the law[.]" *Naranjo*, 2011 WL 4375022, at *1 (citation omitted).  In lengthy, complex litigation such as this, a judge inevitably decides pretrial motions for and against each side.  If adverse rulings were grounds for reassignment, then no judge could ever preside over a case from start to finish.

46

It is also clear that the district judge would have no substantial difficulty complying with this Court's rulings, even if mandamus were to issue. Indeed, the district court fully complied with this Court's ruling in *Naranjo* when it promptly dismissed Chevron's declaratory judgment claim. Defendants' assertion that this case should be reassigned because the district judge has exhibited a "dogged defiance of this Court's prior Opinion" (Pet. at 31) is premised on an erroneous view of the *Naranjo* mandate, as explained above.

Nor is reassignment warranted to ensure the appearance of justice. Defendants advance a one-sided and distorted picture of a judge who has consistently ruled for Chevron and personally orchestrated the litigation against them—allowing "Chevron to inundate" them with motions and resorting to "intentional mismanagement" of its docket designed to prejudice Defendants. Dkt. 75-1 at 5–6. But the truth is that the district judge has fairly adjudicated this complex matter based on the evidence and the applicable law, and has issued numerous significant rulings *against* Chevron.[26] The respective parties have filed a roughly equal num-

---

[26] Among other rulings, the court: (1) dismissed several of Chevron's causes of action (RA405); (2) refused to grant Chevron's summary judgment motion on Defendants' collateral estoppel defense, despite Defendants' failure to submit *any* evidence or substantive response (*Donziger*, 886 F. Supp. 2d at 292); (3) denied Chevron's renewed motion for summary judgment (RA957); (4) refused to attach or enjoin assignment of Defendants' assets (RA256); (5) denied Chevron's summary judgment motion on its state-law deceit claim against Donziger (RA779); and (6) denied Chevron's motion to quash the deposition of its CEO (RA1039).

ber of substantive motions,[27] "Defendants' requests for discovery from Chevron have exceeded Chevron's requests . . . both in number and in scope,"[28] and the district judge has often gone out of his way to accommodate Defendants, most recently by granting Donziger's request to extend the discovery cut-off because his counsel withdrew (after assuring the court that withdrawal would not cause delay because Donziger was prepared to proceed under the existing schedule).  RA1054.

Defendants also assert that the district judge should be reassigned because he has an "antipathy for the ROE and its courts."  Pet. at 35, 38 n.61.  Yet Defendants primarily rely on a handful of out-of-context statements made during hearings three years ago in related discovery litigation (*id*. at 10), ignoring that this Court *affirmed* the district court's rulings in that proceeding and noted "the exemplary manner in which the able District Judge has discharged his duties."  *Lago Agrio Plaintiffs*, 409 F. App'x at 396.  Moreover, any concerns the district court has expressed about Ecuador and its courts are both relevant to the claims and defenses at issue in this action and are firmly supported by the record, including reports of the U.S. State Department.  *See, e.g.*, A1704–05; RA596–612.[29]  For example, in a

---

[27]  By the district court's count, as of May 17, 2013, Defendants and the LAPs' counsel Patton Boggs had collectively filed 39 substantive motions in this action; Chevron had filed 46.  RA1047 n.6.  And since May 17, 2013, Defendants' combined filings have *tripled* Chevron's.  *See* Mastro Decl. ¶ 2.

[28]  *See* RA1049.  In addition, Chevron has produced "over 300 times as many documents to [D]efendants as [D]efendants have to Chevron."  *Id*.

[29]  Events in Ecuador since this Court's mandate in *Naranjo* shed further light on

2011 report on human rights in Ecuador, the State Department concluded, among other things, that "[w]hile the constitution provides for an independent judiciary, in practice the judiciary was susceptible to outside pressure and corruption" including "bribes for favorable decisions," and that "[j]udges occasionally reached decisions based on media influence or political and economic pressures." A1705.[30]

Reassignment at this late stage (three months before trial) would also result in a substantial waste of judicial resources. *See, e.g.*, *Martens v. Thomann*, 273 F.3d 159, 175 (2d Cir. 2001) (denying reassignment request where district judge was "intimately familiar" with "a large, complex, and long-lived class action suit"). After having presided over this and related actions for more than three years, the district judge has become intimately familiar with the factual back-

---

that country and the rule of law there, including: (a) ROE President (and LAPs supporter) Rafael Correa has called the international arbitral tribunal presiding over Chevron's claims against the ROE "pimps" (Dkt. 58-13); (b) in a highly publicized example of government harassment and persecution, *El Universo* journalists critical of the Correa administration were given a $40 million fine and a three-year prison sentence in a judgment ghostwritten by Correa's lawyer (the journalists eventually received pardons after pressure from the international human rights community), *see* RA284–90; and (c) Correa and the ROE have formed an alliance with Iran in defiance of international sanctions, *see* Ex. 18.

[30] Defendants complain about a protective order precluding their Ecuadorian agents from accessing a few declarations filed under seal. Pet. at 36–38. The district court set forth in detail the reasons and evidence supporting its decision and the need to protect the Ecuadorian witnesses who came forward—including the fact that Defendants' Ecuadorian agents have repeatedly stated that they do not consider themselves bound by the court's orders. *See* A1691–703 (outlining history of the LAPs' agents threating and intimidating witnesses, including through trumped-up criminal charges in Ecuador filed with President Correa's support).

49

ground and the numerous witnesses and events at issue. Reassignment would squander all of this significant effort and unique insight, and would force another district judge to embark on the monumental task of becoming familiar with the extensive factual and procedural history of this case.

In short, the district judge has done an expert job of steering a contentious case through discovery and toward trial, devoting countless hours considering the arguments and authorities presented, and issuing timely, detailed rulings. The district court's conduct of the proceedings below merits this Court's commendation, not censure. Indeed, reassignment would reward Defendants' improper strategy of creating a false narrative through court filings, press releases, and blog postings designed to intimidate a respected federal judge and subject him to public ridicule, which they then seek to bootstrap as "evidence" to support their claims about the appearance of justice. *See, e.g.*, Ex. 19 at 1 (Linda Greenhouse of the *New York Times* observing that "[t]he effort to force or shame off a case a judge deemed likely to be unsympathetic is becoming the latest weapon in a litigator's arsenal—litigation by other means"); *see also In re United States*, 666 F.2d 690, 694 (1st Cir. 1981) (requiring recusal due to "unfavorable comment in the media" would give "litigants or third parties . . . a negative veto over the assignment of judges").

## CONCLUSION

For the foregoing reasons, the Court should deny the mandamus petition.

50

Dated: July 15, 2013

Respectfully submitted,

/s/ Randy M. Mastro

Gibson, Dunn & Crutcher LLP
Randy M. Mastro
Andrea E. Neuman
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

William E. Thomson
333 South Grand Avenue
Los Angeles, California 90071
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

*Attorneys for Respondent*
*Chevron Corporation*