# 13-772-cv

## IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT



## IN RE HUGO GERARDO CAMACHO NARANJO AND JAVIER PIAGUAJE PAYAGUAJE,

Petitioners.

ON PETITION FOR WRIT OF MANDAMUS TO THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
(NO: 11-CV-0691-LAK)

## PETITIONERS' MEMORANDUM OF LAW IN OPPOSITION TO THE CHAMBER OF COMMERCE OF AMERICA'S MOTION FOR LEAVE TO FILE BRIEF AS AMICUS CURIAE

JAMES E. TYRRELL, JR.
PATTON BOGGS LLP
1185 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10036
(646) 557-5100

– AND –

ONE RIVERFRONT PLAZA, 6TH FLOOR
NEWARK, NEW JERSEY 07102
(973) 848-5600

*Attorneys for Petitioners Hugo Gerardo Camacho Naranjo
and Javier Piaguaje Payaguaje*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................1

ARGUMENT ....................................................................................5

I.     THE CHAMBER LACKS A SPECIAL INTEREST
       JUSTIFYING AMICUS STATUS ......................................................5

II.    THE CHAMBER CANNOT EXPLAIN AWAY THE
       EVENTS AT THE HEART OF PETITIONERS'
       REASSIGNMENT REQUEST ............................................................7

III.   THE CHAMBER'S FOCUS ON THE AMAZON
       COMMUNITIES' PRESS STATEMENTS IS MISGUIDED ...........12

CONCLUSION ..................................................................................18

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aguinda v. Texaco, Inc.*,
  142 F. Supp. 2d 534 (S.D.N.Y. 2001) .........................................................15, 16

*Alexander v. Primerica Holdings*,
  10 F.3d 155 (3d Cir. 1993) ...................................................................6

*Cobell v. Kempthorne*,
  455 F.3d 317 (D.C. Cir. 2006) ...............................................................6

*Halo Wireless, Inc. v. Alenco Commc'ns. Inc.*,
  684 F.3d 581, 596 (5th Cir. 2012) ..........................................................5

*In re Drexel Burnham Lambert, Inc.*,
  861 F.2d 1307 (2d Cir. 1988) ...............................................................13

*Johnson v. Sawyer*,
  120 F.3d 1307 (5th Cir. 1997) ..............................................................12

*Mechmet v. Four Seasons Hotel, Ltd.*,
  No. 84 C 7341, 1985 WL 766 (N.D. Ill., April 25, 1985) ...................................3

*Republic of Ecuador v. Chevron Corp.*,
  638 F.3d 384 (2d. Cir. 2011) ...............................................................17

*Research Corp. Techs. v. Microsoft Corp.*,
  536 F.3d 1247 (Fed. Cir. 2008) .............................................................12

*Ryan v. Commodity Futures Trading Commission*,
  125 F.3d 1062 (7th Cir. 1997) ...........................................................5, 10

*Strasser v. Doorley*,
  432 F.2d 567 (1st Cir. 1970) ................................................................5

*Trimed, Inc. v. Stryker Corp.*,
  608 F.3d 1333 (Fed. Cir. 2010) .............................................................12

*United States. v. Lentz*,
  383 F.3d 191 (4th Cir. 2004) ...............................................................12

*United States v. Alkaabi,*
 223 F. Supp. 2d 583 (D.N.J. 2002) .......................................................................5

*United States v. Bayless*,
 201 F.3d 116 (2d Cir. 2000) ..............................................................................13

*United States v. Certain Land Located in County of Barnstable*,
 674 F.2d 90 (1st Cir. 1982)..................................................................................3

*United States v. City of New York,*
 717 F.3d 72 (2d Cir. 2013) ..................................................................................8

*United States v. Robin,*
 553 F.2d 8 (2d Cir. 1977) ....................................................................................8

*United States v. Torkington*,
 874 F.2d 1441 (11th Cir. 1989) ...........................................................................6

*Yablonski v. United Mine Workers of Am.*,
 454 F.2d 1036 (D.C. Cir. 1972).........................................................................7

## STATUTES

28 U.S.C. § 455(a) ..................................................................................................6

28 U.S.C. §1782 ....................................................................................................17

## OTHER AUTHORITIES

Federal Rule of Appellate Procedure 29(b)(2) ....................................................3, 6

Wright and Miller Vol. 16AA § 3975....................................................................3

# INTRODUCTION

Respondent Chevron[1] is a member of and one of the largest financial contributors to proposed amicus curiae, U.S. Chamber of Commerce (the "Chamber").[2] Chevron's Vice President and General Counsel, R. Hewitt Pate, sits on the Board of Directors of the National Chamber Litigation Center,[3] the self-described "litigation arm" of the Chamber responsible for "engag[ing] in strategic amicus curiae litigation in courts across the country."[4]

According to a 2008 memorandum in which Chevron laid out a strategy to subvert the Ecuadorian court proceedings by, among other tactics, destabilizing U.S.-Ecuador relations, Chevron discussed "[p]rovid[ing] funding to the US Chamber of Commerce" with the intent to "create an organization solely devoted to addressing the issues of Ecuador and actively attacking its position on business,

---

[1] Abbreviated terms used herein are intended to have the same meaning as that set forth in the Table of Abbreviations included with the original Petition. (*See* Dkt. 1-1 at 6-7.)

[2] Eric Lipton et al., *Top Corporations Aid U.S. Chamber of Commerce Campaign*, N.Y. Times, Oct. 21, 2010, at A1, *available at* http://www.nytimes.com/ 2010/10/22/us/politics/22chamber.html; *see also* John S. Watson, Vice Chairman of the Board, Chevron Corporation, Remarks to the United States Chamber of Commerce (Oct. 27, 2009), *available at* http://www.chevron.com/news/speeches /release/?id=2009-10-27-jwatson (last visited Aug. 5, 2013).

[3] National Chamber Litigation Center, Board of Directors, http://www. chamberlitigation.com/about/board (last visited Aug. 5, 2013).

[4] National Chamber Litigation Center, http://www.chamberlitigation.com/about (last visited Aug. 5, 2013).

1

the media, international loans, and Socialist policies . . . ."[5]  (Declaration of James

E. Tyrrell, Jr., dated August 7, 2013 ("Tyrrell Decl."), Ex. 1 at CVX-RICO-

4746093.)  Since that time, as Chevron's efforts to evade its Ecuador liabilities

have become more feverish, the amount of disclosed money that Chevron has

poured annually into the Chamber's coffers has *quadrupled*, with contributions of

$250,000 in 2008 and 2009,[6] $500,000 in 2010 and 2011,[7] and $1,000,000 in

2012.[8]    Chevron's internal documents, however, ████████████████████

████████████████████████████████████████████████████

---

[5] In addition to using the Chamber to lay the political groundwork necessary for Chevron to justify scoffing at Ecuador's courts, Chevron's strategy entailed instilling distrust of Ecuador directly into the public consciousness.  The company considered adopting "Ecuador: the next major threat to America?" as one of the company's "message themes," whereby the American public would be led to "wonder if Ecuador is the next Cuban missile crisis in the making."  (Tyrrell Decl., Ex. 1 at CVX-RIC0-4746091.)

[6] Center for Political Accountability, 2008 Chevron Corporate Political Contributions, http://www.politicalaccountability.net/index.php?ht=a/Get DocumentAction/i/3391 (last visited Aug. 5, 2013); Center for Political Accountability, 2009 Chevron Corporate Political Contributions, http://www.politicalaccountability.net/index.php?ht=a/Get DocumentAction/i/5226 (last visited Aug. 5, 2013).

[7] Center for Political Accountability, 2010 Chevron Corporate Political Contributions, http://www.politicalaccountability.net/index.php?ht=a/Get Document Action/i/7079 (last visited Aug. 5, 2013); Center for Political Accountability, 2011 Chevron Corporate Political Contributions, http://politicalaccountability.net/index.php?ht=a/GetDocument Action/i/7080 (last visited Aug. 5, 2013).

[8] Chevron Corporation, 2012 Chevron Corporate Political Contributions, http://www.chevron.com/documents/pdf/Political-Contributions-2012.pdf  (last  visited Aug. 5, 2013).

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████[9] (*See* Petitioner's Motion to Seal, Ex. B.)

Neither Chevron nor the Chamber can dispute that "an amicus ought to add something distinctive to the presentation of the issues, rather than a conduit for the views of one of the parties."[10]  Proposed amici must demonstrate its interest in the dispute, "why an amicus brief is desirable and why the matters asserted are relevant to the disposition of the case."[11]  In short, amici tend to add nothing but increased burden on the Court when they "are so strongly aligned with [one] side such that that side can, in effect, file multiple briefs in support of its position."[12] To describe Chevron and the Chamber as "strongly aligned" would be to understate the relationship.  As a result, the Chamber's proposed amicus brief

---

[9] The Chamber is not forthcoming about its relationship with Chevron. The Chamber's motion is silent on that topic.  And without disclosing even that Chevron is a member of the Chamber, the Chamber's proposed amicus brief coyly states that "[n]o party, no party's counsel and no other person — other than amicus curiae, its *members*, or its counsel — contributed money that was intended to fund preparing or submitting the brief."  (Dkt.135 at 21 n.1 (emphasis added).)

[10] 16A Wright and Miller, Federal Practice and Procedure § 3975 at 313.

[11] Federal Rule of Appellate Procedure 29(b)(2).

[12] *Mechmet v. Four Seasons Hotel, Ltd.*, No. 84 C 7341, 1985 WL 766, at *1 (N.D. Ill., April 25, 1985); *see also United States v. Certain Land Located in County of Barnstable*, 674 F.2d 90, 91 n.1 (1st Cir. 1982).

3

betrays the organization's lack of any "interest" or unique perspective other than a desire to aid Chevron by duplicating many of the company's arguments.

To justify throwing its perceived weight behind Chevron, the Chamber submits that its members somehow have a unique interest in preventing *meritless* requests for reassignment. This a principle on which all litigants, including Petitioners, would agree, but it merely begs the ultimate and inherently fact-specific question—whether the instant request for reassignment should be granted.

Reaching for a public-policy angle to justify what is essentially an additional opposition to this request for reassignment on its merits, the Chamber follows Chevron's lead and aims to engender confusion about the basis for Petitioners' request. The Chamber attempts to cast the Petition as symptomatic of a larger phenomenon whereby litigants generate media coverage to create a basis for reassignment. But Petitioners' request for reassignment is not the least bit reliant on critical press coverage, self-fulfilling or otherwise. Nor is the premise of Petitioners' request a simplistic laundry list of complaints about hostile rulings, as the Chamber suggests. Rather, Petitioners reference the history of proceedings before the district court mainly to contextualize what lies at the *core* of the reassignment request: the district court's systematic frustration of this Court's mandate. On that topic, the one that matters most, the Chamber does nothing more

4

than parrot Chevron's arguments in the most summary fashion.  The Chamber's

motion for leave to appear as amicus curiae should be denied.

## **ARGUMENT**

## I.   **THE CHAMBER LACKS A SPECIAL INTEREST JUSTIFYING AMICUS STATUS**

The Chamber lends no "unique information or perspective" to the

reassignment request pending before this Court.[13]   The Chamber frames its

"interest" as a concern that rewarding an ostensibly "improper tactical use of a

request for reassignment" would encourage other litigants to "manipulate the U.S.

judicial process" by filing similarly meritless petitions, thus jeopardizing "the

effective and efficient functioning of," as well as the "international reputation" of,

the U.S. judiciary.  (Dkt. 135 at 21-22.)  This concern is not unique to the business

community; it is indisputable to the point of being facile.  *Any* organization

interested in the proper administration of justice would agree that *baseless* petitions

for reassignment should be discouraged.   The converse is also true.   Just as

routinely displacing judges without good reason would erode the public's

confidence in the judiciary, so too would denying valid requests for reassignment.

Indeed, the reassignment mechanism exists to preserve "public confidence in the

---

[13] *Ryan v. Commodity Futures Trading Commission*, 125 F.3d 1062, 1063-64 (7th Cir. 1997); *see also Halo Wireless, Inc. v. Alenco Commc'ns. Inc.*, 684 F.3d 581, 596 (5th Cir. 2012); *Strasser v. Doorley*, 432 F.2d 567, 569 (1st Cir. 1970); *United States v. Alkaabi,* 223 F. Supp. 2d 583, 592 (D.N.J. 2002).

judicial system" and the "appearance of neutrality and impartiality in the administration of justice."[14]

What it all comes down to, then, is whether Petitioners' request for reassignment is or is not valid. But the Chamber has no unique competence to assist the Court in resolving what the Chamber itself admits is, by its nature, a "highly fact-sensitive inquir[y] . . . ." (Dkt. 135 at 30.) Nevertheless, that is exactly what the Chamber endeavors to do, albeit under the guise of philosophical discourse. To reach its ambitious conclusion that reassignment in this case would "threaten[] the independence of the judicial system," the Chamber argues that Petitioners (1) "failed to set forth facts that justify the extraordinary remedy of reassignment," and (2) used the media to "manufactur[e] controversy surrounding a judge's impartiality." (Dkt. 135 at 26, 29, & 32.) Despite their incongruity with

---

[14] *Alexander v. Primerica Holdings*, 10 F.3d 155, 157 (3d Cir. 1993) (on petition for writ of mandamus, declining to recuse district judge under 28 U.S.C. § 455(a), but nevertheless ordering *reassignment* because "irrespective of the requirements of § 455(a), we have supervisory authority to order this case reassigned to another district court judge"); *see also United States v. Torkington*, 874 F.2d 1441, 1447 (11th Cir. 1989) (remanding with instruction to reassign, observing that reassignment exists to help courts "respond to the appearance of a lack of neutrality and act to preserve in the public mind the image of absolute impartiality and fairness of the judiciary."); *Cobell v. Kempthorne*, 455 F.3d 317, 335 (D.C. Cir. 2006) (remanding with instruction to reassign, noting that "justice must satisfy the appearance of justice, . . . – that is, reasonable observers must have confidence that judicial decisions flow from the impartial application of law to fact, not from a judge's animosity toward a party . . . .").

the purpose of amicus participation, Petitioners are compelled to respond to the Chambers' criticisms.

## II. THE CHAMBER CANNOT EXPLAIN AWAY THE EVENTS AT THE HEART OF PETITIONERS' REASSIGNMENT REQUEST

The Chamber spends most of its time on the margins, concerning itself with matters ancillary to, or, like the Chamber's criticisms regarding the Amazon communities press statements, irrelevant to the reassignment issue. (*See infra* at Section III.)  The Chamber devotes just a few, superficial words to the crux of Petitioners' reassignment request: the district judge's refusal, despite this Court's directives, to relinquish his perceived authority to condemn a foreign judgment at the request of a foreign judgment debtor.  The Chamber parrots Chevron's coy assertion that the district judge did not, in the first place, offend the Court's Mandate because all the Mandate required of him was to dismiss Count Nine (which he did)—ignoring the fact that mandamus lies to rectify an action "contrary to either the letter or *spirit of the mandate construed in the light of the opinion*" underlying the mandate . . . ."[15]  (*See* Dkt. 135 at 30; *see also* Dkt. 111 at 35.)  The Chamber also points out that the "district judge has not *announced* an intention" to defy this Court, and submits that the district judge could not have appreciated that his conduct ran contrary to this Court's pronouncements.  (*See* Dkt. 135 at 30

---

[15] *Yablonski v. United Mine Workers of Am.*, 454 F.2d 1036, 1038 (D.C. Cir. 1972) (emphasis added).

(emphasis added).)  Whether or not true—and we strongly disagree with the latter point—both points miss the mark.  Reassignment is not meant to punish judicial bad behavior; rather, it is about avoiding the "*appearance* of partiality" to maintain public confidence in the institution, regardless of scienter.[16]

In any event, though unnecessary for reassignment, the record bespeaks intent.  Petitioners brought the district court's violation of the Mandate to its attention on numerous occasions before filing this Petition and requesting reassignment.[17]  The district court's increasingly dismissive rejection of those efforts, particularly contrasted with its approach to similar applications made by Chevron, illustrates the pains taken by Chevron and the district court to frustrate this Court's Opinion and Mandate, evidencing a deeply-rooted and a fundamental disagreement with their animating principles. (*See, e.g.*, Dkt. 1-1 at 20-28.)

Indeed, though the Chamber purports to defend the district judge's conduct, it avoids any examination of that conduct.  For example, the Chamber does not

---

[16] *United States v. City of New York,* 717 F.3d 72, 99 (2d Cir. 2013) (observing that reassignment may be necessary "even in the absence of bias, to avoid an appearance of partiality . . ."); *United States v. Robin,* 553 F.2d 8, 9 (2d Cir. 1977) (observing that reassignment concerns the "preservation of the appearance of fairness").

[17] Ironically, while claiming that the district court could not have known that its conduct was violating the Mandate, the Chamber derides Petitioners' multiple requests for the district court to correct its own error as a waste of resources.  (Dkt. 135 at 32.)  Similarly, Chevron relies on Petitioners' caution in making these requests before seeking mandamus relief as the basis for its meritless claim that the Petition is untimely.  (Dkt. 111 at 33.)

endeavor to explain why it was not until this Court's Mandate issued that the district judge found Petitioners' boilerplate "collateral estoppel" defense to be an unmistakable invitation to rule on the enforceability of the Ecuadorian judgment. (*See* Dkt. 1-1 at 21-28.)   Nor does the Chamber explain how to reconcile this Court's Opinion with the district court's refusal to allow Petitioners to define or timely amend our pleading on the reasoning that "allowing [Petitioners] to take the issue of recognizability and enforceability off the table in this case while preserving it in every other court in this and other nations would be to acquiesce in a blatant exercise in forum shopping."  (*See id*. at 28-34.)

Likewise, the Chamber omits any reference to the district judge's *second* affront to this Court's Opinion and Mandate: his ruling that Chevron, should it succeed on its "fraud" claim, would be entitled to an equitable "setting aside" of the Ecuadorian judgment.   In fact, Chevron has indicated that it is considering whether to pursue *only* equitable relief, in lieu of damages.[18]  (*See* Tyrrell Decl.,

---

[18] Chevron is perhaps feeling less confident in its chances with a jury now that its key witness, former Ecuadorian judge Alberto Guerra Bastides ("Guerra"), has admitted "exaggerating" in order to extract a larger benefits package from Chevron.  At his deposition, Guerra, who claims to be aware of a bribery scheme involving Ecuadorian Judge Nicolas Zambrano and counsel for the Amazon communities (A1637 ¶ 22; A1653), admitted that, to "improve [his] negotiating position" vis à vis Chevron, he "told Chevron several things. Some of them were true, others were exaggerations."  (Tyrrell Decl., Ex. 9 at 155:15-16; 168:11-13.) Guerra—who had no salary at the time and only had enough saved to cover two months of ordinary expenses (Tyrrell Decl., Ex. 10 at 17)—ultimately extracted

Ex. 4 at 21:21-24.)  On July 18, 2013, Chevron's counsel represented that "[t]here is still some consideration, on our part, *in the event the counterclaims on the other side were dismissed*, of whether equitable relief would suffice in this case."  (*Id.* (emphasis added).)  Several days later, the district judge dismissed Donziger's long-pending counterclaims against Chevron.  (Tyrrell Decl., Ex. 5.)  This development brings to the fore a question: what "equitable relief" does Chevron expect to receive?  The only equitable relief identified explicitly in its Complaint is the temporary injunction vacated by this Court, and a permanent version of the same. (*See, e.g.*, A789-791.)  Chevron must also have in mind some other form of equitable relief—e.g., that the Ecuadorian judgment will be "set aside" on the basis of alleged fraud.

Still, Chevron maintains that the district judge did not actually rule that equitable "set aside" is available to it, but rather, observed that such relief exists only for "hypothetical" purposes.  (*See* Dkt. 111 at 14.)  The record says otherwise.  Concluding that it would be fruitless to certify for interlocutory appeal a question about the viability of Chevron's fraud claim, the district judge held that, regardless of whether Chevron would be entitled to damages on that claim, it is indisputably entitled to equitable relief from the Ecuadorian judgment:

---

from Chevron a benefits package worth roughly $326,000 to be paid over the next two years, with the option of renewal. (*See* Dkt. 39-6 at 62-64.)

Relief for fraud in the procurement a prior judgment long was available in independent actions in equity. The merger of law and equity effected no substantive change. All relief that formerly was available in equity remains available. As the Second Circuit has put it, "[r]elief from a final judgment may also be obtained at any time by way of an independent action to set aside a judgment for 'fraud upon the court.'"

* * *

[T]he LAP Representatives have advanced no persuasive basis for supposing that there is a substantial basis for difference of opinion with respect to the question whether *plaintiff [Chevron], if it prevails on its claim of fraud in the procurement of the Judgment, would be entitled to at least the relief that would have been available to it in a court of equity* in like circumstances prior to the merger of law and equity.

(A1608-1611 (internal citations omitted).) There is nothing "hypothetical" about the foregoing. The district judge has again invited foreign judgment debtors to attack foreign judgments in New York, undermining the "creditor's choice" framework of foreign judgment enforcement.

Finally, the Chamber contends that reassignment at this stage of the proceeding would cause intolerable delay. (Dkt. 135 at 31-32.) Though Chevron filed its Complaint in February 2011, the proceedings below—which were stayed in favor of the severed Count Nine—commenced essentially in February 2012, after the issuance of this Court's mandate dismissing Count Nine. (*See* Tyrrell Decl., Exs. 6 & 7.) Trial is slated for October 15, 2013. (Tyrrell Decl., Ex. 8.) Chevron seeks a ruling that a *20-year* legal battle against the company is actually a RICO enterprise, and is attempting to nullify the results of *nine years* of litigation

11

in Ecuador.  That it has taken little more than a year and a half for Chevron to

reach the precipice of this end-game does not militate against reassignment, as the

Chamber contends.  Taken in context, the timing instead bespeaks the fact that

Petitioners' right to due process was sacrificed in the name of beating their chosen

enforcement courts to the punch—an improper goal to begin with.  In any event,

whatever comparatively modest efficiencies would result from continuing to

proceed as is "pale in comparison" to the countervailing need to rid the

proceedings of partiality, or the appearance thereof.[19]

## III.  THE CHAMBER'S FOCUS ON THE AMAZON COMMUNITIES' PRESS STATEMENTS IS MISGUIDED

The Chamber's charge that Petitioners are asking "this Court to reassign the

case to cure the appearance of bias that [they] themselves have conjured" largely

---

[19] *See*, *e.g.*, *Johnson v. Sawyer*, 120 F.3d 1307, 1334, 1337 n.8 (5th Cir. 1997) (ordering reassignment notwithstanding the "tortured, expansive (and expensive) history" of the case "because of the necessity to preserve the appearance of impartiality, fairness, and justice," and because the "loss of efficiency and economy pales in comparison to this"); *Trimed, Inc. v. Stryker Corp.*, 608 F.3d 1333, 1344 (Fed. Cir. 2010) (reassigning case after four years of litigation, following completion of discovery, multiple rounds of summary judgment motions, and two appellate reversals of summary judgment,  because "[a]lthough mindful of the burden reassignment places on judicial resources . . . we are convinced that reassigning this matter to a different judge is necessary to preserve the appearance of justice."); *U.S. v. Lentz*, 383 F.3d 191, 221-22 (4th Cir. 2004)*; Research Corp. Techs. v. Microsoft Corp.*, 536 F.3d 1247, 1255-56 (Fed. Cir. 2008) (reassigning case after granting of summary judgment motions and orders on motions *in limine*, because the "strongly expressed convictions of the trial court in this case may not be easily and objectively reconsidered," despite the fact that "a transfer may require a new judge to learn material and thus may occasion some duplicative judicial effort.").

by "proliferating attacks on [the district judge's] integrity in the press" is invented. (Dkt. 135 at 27.)  While it is true that the reassignment analysis "may not . . . be defined by what appears in the press,"[20] that point is irrelevant here.  Nowhere do Petitioners submit that this Court should grant reassignment in light of public commentary or media coverage criticizing the district judge.  And, in light of that fact, it appears that the Chamber's focus on the Amazon communities' pointed remarks in the press is intended not to inform a discussion of any cognizable legal augment, but rather, to color the Court's view of Petitioners (and thus, their requests for relief).

    In closing, two points must be made regarding the Chambers' admonishment of Petitioners for purportedly "heaping abuse" on the judiciary.

    *First*, the Chamber's admonishments are ironic (and perhaps hypocritical), in that the unnecessary and unfortunate besmirching of the *Ecuadorian* judiciary is a defining characteristic of Chevron's claims and the district court proceedings. Chevron waged war on the Ecuadorian judiciary.  The company moved for the recusal of multiple judges in Ecuador—under suspect circumstances—delaying

---

[20] *In re Drexel Burnham Lambert, Inc.*, 861 F.2d 1307, 1309 (2d Cir. 1988) (court declining to adopt "a *per se* rule holding that when someone claims to see smoke, we must find that there is fire."); *see also United States v. Bayless*, 201 F.3d 116, 129 (2d Cir. 2000) ("[O]ur court [has] emphasized one of the serious problems with ruling that media attacks on a judge can be readily made the basis for recusal: parties who are sophisticated in their dealings with the press might then be able to engineer a judge's recusal for their own strategic reasons.").

resolution of the Lago Agrio Litigation for months if not years.[21]  The judge who took over after Chevron's final recusal was immediately threatened by the company with criminal sanctions, including imprisonment.  (Tyrrell Decl., Ex. 16 at 9 ("If the Judge denies or ignores my petition, this will be committing the criminal offense set out in Article 292 of the Penal Code."); Ex. 17 at 25 ("If you fail to do so, Your Honor would be committing a criminal offense punishable with imprisonment, and in turn would be rendering any rulings you make in this case from the moment the offense is committed null and void.").)  In its final Judgment, the Sucumbíos Trial Court observed that Chevron's disparagement of the judiciary had been "constant . . . throughout these proceedings which have even been repeated publicly by [Chevron's] spokespersons, and various affronts to his

---

[21] In one such instance, a Chevron contractor entered the judge's chambers under false pretenses, armed with a hidden camera, and attempted to elicit improper statements from him. (*See* Tyrrell Decl., Ex. 13.)  The judge stepped down in the wake of a Chevron-generated media blitz claiming that he had solicited a bribe on tape (*see, e.g.,* Tyrrell Decl., Exs., 14 & 15), although the New York Times later concluded that "[t]he recordings, made by a former Ecuadorean contractor for Chevron . . . do not make clear whether Judge Núñez was involved in a bribery scheme — or even whether he was aware of an attempt to bribe him." (Tyrrell Decl., Ex. 13.)    Later, Chevron secured the removal of another judge by bombarding him with motions and then seeking recusal under a provision of law that requires trial judges to formally accept filings into the record within a short, specified time period.  Chevron petitioned for the recusal of Judge Leonardo Ordóñez based on his "failure" to address *forty-seven (47)* of the briefs Chevron filed between April 8 and August 5, 2010, which the Sucumbíos Trial Court was obligated to grant under Ecuadorian law.  (*See* Tyrrell Decl., Ex. 19.)    Not coincidentally, this ploy occurred just as Judge Ordóñez issued a formal proclamation—referred to as an "*autos para sentencia*"—indicating that he was on the verge of rendering a judgment.  (Tyrrell Decl., Ex. 20.)

14

judgeship have come to Judge's attention." (A419.)   The three-judge Sucumbíos Appellate Panel, which affirmed the lower court's judgment, described Chevron's litigation tactics as "abusive" and "rarely seen in the annals of administration of justice in Ecuador."  (*See* A1334-35; *see also* A1353.)

Against that backdrop, it is apparent why Ecuadorian judges are outraged to learn that, at the invitation of a litigant which spent the past several years abusing their judicial system, the district judge in this case is now undertaking to condemn Ecuador's courts.  (*See* A1322-23; A1334.)  Chevron's counsel has chided Judge Zambrano in the press for his "failure" to appear for deposition in Peru—the district judge below would not permit depositions to proceed in Ecuador because the country is allegedly too unsafe (Tyrrell Decl., Ex. 21)—to submit himself to a grilling by the losing party in a case he decided. (Tyrrell Decl., Ex. 22 (Chevron's counsel observing that "Judge Zambrano's refusal to testify is more predictable than surprising" because he is part of "plaintiffs['] fraud team").  "All" that Judge Zambrano did was execute a declaration attesting that his judgment was indeed his. (Tyrrell Decl., Ex. 18.)  Were the shoe on the other foot, one can only imagine the district judge's reaction upon being told that he must leave the country to be deposed by a disappointed litigant.

*Second*, while there is no denying that the Amazon communities have expressed anger—much of it stemming from their treatment by the district judge—

in the press, there is nothing "tactical" about that expression: the Amazon communities firmly believe there is much to be indignant about.

They are indignant, for example, because *20 years* after they sued Chevron's predecessor in New York, they find themselves locked in crushing litigation in the same district court that, at Chevron's insistence, once declined to bring their dispute with Chevron to an expedient, final resolution on the reasoning that it has "everything to do with Ecuador and nothing to do with the United States."[22]  And now, everything is upside-down.  They are at the mercy of a district judge who insists not only that justice requires the district court to be the arbiter of their fate, but that any resistance to this notion is a "blatant exercise in forum shopping." (A1457.)   A district judge who rejects this Court's conclusion that Chevron— which "appeared in this Court and reaffirmed the concessions that Texaco had made in order to secure dismissal of" the *Aguinda* litigation[23]—is at least accountable for causing this dispute to move to Ecuador in the first place.[24]  (*See, e.g.*, Dkt. 75-05 at 3-4.)

---

[22] *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 538–39 (S.D.N.Y. 2001).

[23] *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 390 n.3 (2d. Cir. 2011).

[24]  The district judge's refusal to follow this Court's lead in this regard has materially impacted the proceedings below.  Consistent with his view that Texaco, but not necessarily Chevron, wanted to litigate in Ecuador, the district judge (a) rejected Petitioners' contention that the doctrine of "unclean hands" could ever bar Chevron from equitable relief insofar as Chevron charges that Ecuador's courts are too politicized to be respected, when, in fact, evidence now shows that

The Amazon communities are indignant at the unfairness in Chevron's selection of the district judge from among the many who presided over Chevron's nationwide 28 U.S.C. §1782 campaign, upon seeing the judge's obvious distaste for the Amazon communities' lead American lawyer, Steven Donziger (*see, e.g.,* A917-935),[25] as well as the judge's predisposition to doubt the legitimacy of the underlying case against Chevron. (*see, e.g.,* A929-930.)

And, most acutely, the Amazon communities are indignant about the fact that the district judge is holding them in the case on a "third-party fraud" theory in contravention of this Court's precedent (*see* Dkt. 1-1 at 28-30), so that he can purport to bind them with a ruling that the Ecuadorian judgment is unenforceable or equitably "set aside," in defiance of this Court's Mandate and Opinion.

---

Texaco/Chevron wanted the case heard in Ecuador *precisely* because it perceived the courts as politicized in its *favor*; and (b) consequently denied Petitioners' request for discovery concerning Texaco's/Chevron's motives for insisting that the case be tried in Ecuador. (*See* Tyrrell Decl., Ex. 12 at 112:12-113:25; 113:5-24.)

[25] A "confidential" Chevron email from March 2009 reveals that ███████████ ████████████████████████████████████████ (*See* Petitioner's Motion to Seal, Ex. A.) ████████████████████████████████████████ ███████████████████████████████████████. (*See id.*) That cynical litigation strategy was wildly successful before the district judge, who, prior to the inception of Chevron's RICO case, presided over § 1782 discovery actions targeting the director of *Crude* as well as Donziger himself. Petitioners are, at least in part, the victim of what Donziger's former counsel, John Keker, referred to as the district judge's "implacable hostility" toward Donziger as he exited the case. (*See* Dkt. 75-1 at 9.)

The Amazon communities have, at times, vented their extreme frustration with these matters publicly. Perhaps that is not ideal, but it is no basis upon which to decide against Petitioners here.

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Chamber's Motion for Leave to File Brief as Amicus Curiae should respectfully be denied.

Dated: August 7, 2013                    Respectfully submitted,

                  By:    */s/ James E. Tyrrell, Jr.*
                         James E. Tyrrell, Jr.
                         PATTON BOGGS LLP
                         1185 Avenue of the Americas, 30th Floor
                         New York, New York 10036
                         (646) 557-5100

                         – AND –

                         One Riverfront Plaza, 6th Floor
                         Newark, New Jersey  07102
                         (973) 848-5600

                         *Attorneys for Petitioners Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje*